UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

GEORGE SCHMIDT, JR., et. al.,                    CIV. NO. 14-3000 (JRT/JSM)

           Plaintiffs,

                                           **REPORT AND RECOMMENDATION**

v.

DIRECTV, LLC, et. al.,

           Defendants.

The above matter came before the undersigned on Defendant DIRECTV, LLC's

Motion to Dismiss Plaintiffs' Second Amended Complaint [Docket No. 101]; Defendant

DirectSat USA, LLC's Motion to Dismiss Plaintiffs' Second Amended Complaint [Docket

No. 102][1] and Plaintiffs' Conditional Motion for Time Within Which to Seek Leave to

Amend Should Court Grant Defendants' Motions to Dismiss Plaintiffs' Second Amended

Complaint [Docket No. 112].  Ryan D. O'Dell, Esq. appeared on plaintiffs' behalf.  Colin

D. Dougherty, Esq. and David W. Asp, Esq. appeared on defendants' behalf.

This matter has been referred to the undersigned Magistrate Judge for a Report

and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(A), (B),

and Local Rule 72.1(c).  [Docket No. 125].

---

[1]      DIRECTV and DirectSat filed separate motions to dismiss, [Docket Nos. 101,
102], but filed a joint Memorandum of Law and supporting documents.  [Docket Nos.
103, 104].

I.      **INTRODUCTION**

This is a suit by fourteen Minnesota satellite television installation technicians, who claim they were employed by DIRECTV, and where applicable, by DirectSat, and consequently, are entitled to the overtime and minimum wage protections of the Fair Labor Standards Act ("FLSA") and damages under Minnesota law governing the construction industry.[2]   Defendants disagree and have moved to dismiss plaintiffs' Second Amended Complaint ("SAC") [Docket No. 99] in its entirety.

II.     **SECOND AMENDED COMPLAINT**

A.      **Allegations Regarding the Relationship Between Plaintiffs, DIRECTV and DirectSat**

Plaintiffs install and repair DIRECTV satellite television service.   SAC, ¶ 24. Plaintiffs alleged that defendants were their employers and to avoid the FLSA, engaged in a "fissured employment" scheme by treating them as independent contractors or employees of subordinate entities not named in the instant suit.   SAC, ¶¶ 1, 44.   A "fissured employment" scheme arises when an entity attempts to shield its role as a direct employer, while at the same time retaining tight control over the method, manner, quantity and quality of production of its "non-employees."   Id., p. 2, n.1.

DIRECTV controls and manages its nationwide corps of service technicians by directly employing them as W-2 employees, and through an employment network of service providers ("Provider Network") consisting of Home Service Providers ("HSPs"), including DirectSat, and Secondary Service Providers ("Secondary Providers"),

---

[2]     All fourteen plaintiffs asserted claims against DIRECTV; eleven of the fourteen plaintiffs (George Schmidt, Jr., Timothy Hanggi, Robert Kiekbusch, Jr., Mitchell Finwall, Dylan Monroe, John Koziol, Tanner Porisch, Vachee Yang, Dennis Gregerson, Craig Wemple, and Jefferey Engelke) also brought claims against DirectSat.

subcontractors, and service technicians.  Id., ¶ 25.  DIRECTV was the primary, if not the only, client of the HSPs and Secondary Providers (referred collectively in the SAC as "Providers") and was the source of substantially all of each Provider's income.  Id., ¶ 27. The Provider Network is organized and operated as a top-down structure, with DIRECTV at the top, controlling employment through contracts with the HSPs and Secondary Providers.  Id., ¶ 29.  The HSPs and Secondary Providers, in turn, enter into contracts with a patchwork of entities DIRECTV refers to as subcontractors, and the subcontractors enter into contracts with the technicians who install the satellite television equipment, although at times, the HSPs or Secondary Providers contract directly with the technicians.  Id.

DirectSat performed similar, middle-management functions between DIRECTV and those plaintiffs who have asserted claims against DirectSat.  Id., ¶ 30.  DirectSat passed along the scheduling from DIRECTV and supervised the technicians.  Id. DIRECTV established the hiring criteria and how the work was to be performed for the employees and contractors of DirectSat, and DirectSat implemented, monitored and enforced those qualifications and requirements.  Id.

DirectSat maintained a contractor file for each ostensible 1099 subcontractor or "independent contractor," which was the equivalent of a personnel file on each technician, and these files were regulated and audited by DIRECTV.  Id., ¶ 31. DirectSat had the power to enter into and terminate the contracts of the 1099 technicians who worked for it, and therefore, had the power to fire and hire those technicians.  Id., ¶ 32.  DirectSat maintained warehouses and other facilities where the

technicians had to go to pick up DIRECTV's equipment and to receive training required by DIRECTV. Id., ¶ 33.

Regardless of how they were employed, either directly or as part of the Provider Network, each DIRECTV technician was required to install equipment pursuant to DIRECTV's policies, procedures, practices, and performance standards, all of which were described and mandated through the Provider Agreements, Secondary Provider Agreements, and Services Provider Agreements. Id., ¶¶ 34-36. The Provider Agreements enabled DIRECTV to control nearly every facet of the technicians' work, down to the DIRECTV shirts they wore and the DIRECTV identification card they were required to show customers. Id., ¶ 37. Installation methods and procedures were mandated by DIRECTV to assure that its equipment was installed consistent with its policies and procedures. Id., ¶ 38.

DIRECTV assigned the technicians a scope of work described in a work order delivered to the technician through a centralized computer software system controlled by DIRECTV, and their daily work schedule was assigned through DIRECTV's dispatching system. Id., ¶¶ 38, 39.

Throughout the work day, the technicians went to the jobs assigned to them on the daily work schedule and were required to check in by telephone with DIRECTV through its dispatching system upon arrival; at the end of the job they were required to report to DIRECTV that the installation was complete. Id., ¶ 41. Through DIRECTV's assignment of work schedules to plaintiffs, DIRECTV could effectively terminate any technician by ceasing to issue any work to those technicians. Id., ¶ 58.

Through its Provider Network, DIRECTV controlled the piece-rate compensation method by which plaintiffs were paid, and exercised significant control over what work plaintiffs performed, as well as where, when and how the work was done. Id., ¶¶ 49, 50. Through the Providers, DIRECTV determined whether plaintiffs' work merited compensation at all and through the Provider Network, DIRECTV administered its piece-rate compensation scheme, including issuing checks to plaintiffs. Id., ¶ 51.

DIRECTV required plaintiffs to purchase and wear a uniform with DIRECTV insignia on it, and display DIRECTV insignia on vehicles driven to customers' homes for installation. Id., ¶ 42.  DIRECTV required plaintiffs to hold themselves out as agents of DIRECTV; controlled installation instructions and required plaintiffs to follow those instructions; published training materials that technicians such as plaintiffs were required to review; required technicians to pass pre-screening and background checks and obtain certification before DIRECTV would assign work orders.  Id., ¶¶ 52-55. DIRECTV used these requirements to control who was hired to install its systems. Id., ¶ 56.  DIRECTV used a network of quality control personnel and field managers to oversee plaintiffs' work. Id., ¶ 57.

Plaintiffs alleged through the Provider Network, DIRECTV imposed its policies and practices uniformly, which created an economic reality driven by its control over plaintiffs and their work, sufficient to establish that DIRECTV, and where applicable, DirectSat, were plaintiffs' employers and subject to liability under the FLSA and Minnesota law. Id., ¶ 64.

### B.   Plaintiffs' Compensation

Every plaintiff was paid pursuant to a piece-rate payment scheme used throughout DIRECTV's network.  Id., ¶ 66.  The FLSA allows employers to pay on a piece-rate basis, provided it pays for all hours worked, including non-productive hours, and pays a premium for hours worked over forty hours in a week, based on the employer's regular rate.  Id. (citing 29 U.S.C. § 207(a)(g); 29 C.F.R. § 778.318(a)).  Where there is no agreement between the employer and employee that the piece-rate pay includes productive and non-productive hours, the FLSA is not satisfied.  Id. (citing 29 U.S.C. ¶ 207(g); 29 C.F.R. § 207(g)).  There was no agreement between the plaintiffs and defendants regarding their pay system, under which they were not paid for all of the hours they worked.  Id., ¶¶ 69, 70.

DIRECTV's piece-rate system did not pay technicians for necessary work they performed.  Id., ¶ 71.  Plaintiffs performed many integral and indispensable tasks for which they were not paid, including assembling satellite dishes, driving to and between job assignments, reviewing and receiving schedules, calling customers to confirm installations, obtaining required supplies, helping other technicians with installations, performing required customer education, contacting DIRECTV to report or activate service, working on incomplete installations, and working on "rollback" installations where plaintiffs had to return and perform additional work on already-completed installations.  Id., ¶¶ 72, 73.  Although plaintiffs worked more than forty hours a week, they were not properly compensated for overtime work because these non-compensable tasks were not included in their regular pay calculations.  Id., ¶ 74.

Plaintiffs were also subject to "chargebacks" by DIRECTV and DirectSat, where DIRECTV and DirectSat deducted amounts from plaintiffs' pay if there were issues with an installation or questions from a customer, generally up to 90 days after a customer's service was activated.  Id., ¶ 75.  The chargebacks would occur for many reasons outside plaintiffs' control, such as faulty equipment, customer calls regarding how to operate their remote or a customer's failure to give a greater than 95% satisfaction rating for the technician's services.  Id.  Plaintiffs were also required to purchase supplies and pay for their own gas. Id., ¶ 76.

Plaintiffs alleged that "in virtually every workweek, [they] worked more than 40 hours per week for DIRECTV;" they "were not paid the overtime premium required by applicable law for work done beyond 40 hours in a given workweek;" and "the policy and practice of imposing 'chargebacks,' failing to compensate [them] for all hours worked, and failing to reimburse [their] necessary business expenses resulted in [them] routinely working more than forty hours in a work week while being denied overtime pay and being subjected to an effective wage rate below that required by applicable law." Id., ¶¶ 78-80.

For each plaintiff, the SAC alleged that "in virtually every workweek" they each worked more than forty hours per week, were not compensated for their overtime, and were subject to chargebacks and unreimbursed business expenses, which reduced their pay substantially.  See SAC, ¶¶ 87-90 (allegations regarding George Schmidt, Jr.); 93-96 (Timothy Hanggi); 99-102 (Dan Benjegerdes); 105-108 (Robert Kiekbusch, Jr.); 111-114 (James Nord); 117-120 (Mitchell Finwall); 122-126 (Dylan Monroe); 128-132 (John Koziol); 134-139 (Tanner Porisch); 141-144 (Neill Jerry); 147-150 (Vachee Yang);

153-156 (Dennis Gregerson); 159-162 (Craig Wemple); 165-168 (Jeffery Engelke).  As no plaintiff possessed all of the documents or records bearing on their damages, based on their respective recollections, each plaintiff provided an estimate per week of the number of hours worked; the number of hours spent that were not assigned a piece rate and for which there was no payment; the amount of chargebacks incurred; and the amount of the unreimbursed business expenses incurred.  Id.

C.    **Previous Litigation Involving Plaintiffs**

The SAC described previous litigation involving some of the same plaintiffs. Schmidt, Hanggi, Benjegerdes, Kiekbusch, Nord, Finwall, Monroe, Koziol, Jerry, Yang and Engelke previously opted into a conditionally certified FLSA suit in the Eastern District of Louisiana, Lang v. DIRECTV, Civ. No. 10-1085.  Lang was pending as a collective action until the court granted the parties' joint motion decertifying the class. Id., ¶ 82.  The court dismissed the opt-in plaintiffs' claims without prejudice to their right to pursue their individual claims and ordered the statute of limitations be tolled for 60 days from the date of the order.  Id.  Within 60 days, the above named plaintiffs and Porisch filed suit in the Central District of California; ultimately, the suit was transferred to Minnesota. Id., ¶ 83.

Plaintiffs Kiekbusch, Gregerson and Wemple were opt-in plaintiffs in Arnold v. DIRECTV, Civ. No. 10-0352, E.D. Mo., a collective action pending in the Eastern District of Missouri.  Id.  The district court dismissed the suit without prejudice to their ability to pursue their individual claims, and tolled the statute of limitations for 90 days.[3]

---

[3]    The SAC is silent as to the disposition of Kiekbusch's claims in Arnold v. DIRECTV.

### D.   <u>Claims Against Defendants</u>

Count I alleged that DIRECTV and DirectSat violated the FLSA by failing to pay plaintiffs minimum wage and overtime wages, failing to properly calculate plaintiffs' regular rate of pay for determining the overtime due to them, and improperly deducting money from plaintiffs' pay. <u>Id.</u>, ¶ 175.

Plaintiffs also alleged that they were entitled to damages against DIRECTV equal to the mandated minimum wage and overtime premium pay for the three years preceding the filing of their consents to join the <u>Lang</u> or <u>Arnold</u> litigation, plus periods of equitable tolling (for Gregerson and Wemple), because DIRECTV acted willfully and knew or showed reckless disregard in its violation of the FLSA. <u>Id.</u>, ¶ 176, n.20. Likewise, plaintiffs asserted they were entitled to damages against DirectSat for its willful and reckless conduct equal to the mandated minimum wage and overtime premium pay for the three years preceding the filing of the (1) original complaint in this action, (<u>i.e.</u> November 1, 2013, for Schmidt, Hanggi, Kiekbusch, Finwall, Monroe, Koziol and Porisch); (2) first amended complaint in this action, (<u>i.e.</u>, December 23, 2013, for Yang); or (3) this amended complaint (<u>i.e.</u>, for Gregerson, Wemple and Engelke) plus periods of equitable tolling. <u>Id.</u>, ¶ 177, n.21-23.

Plaintiffs alleged that defendants' conduct was willful in that DIRECTV and other members of the Provider Network knew or should have known that their fissured employment scheme used piece-rate systems that unlawfully denied plaintiffs their minimum wages, overtime wages, and other employment benefits. <u>Id.</u>, ¶ 179. In support, plaintiffs claimed that "the Provider Network is purposefully designed to exercise the right of control over DIRECTV's technician corps while avoiding the

responsibility of complying with the requirements of the FLSA" (SAC, ¶ 44); DIRECTV
and DirectSat's policies and practices ensured that DIRECTV controlled its technicians'
work, while deliberately disclaiming their status as employees under state and federal
employment laws (SAC, ¶ 62); by imposing its policies and practices to mask the
economic realities of its employment relationship with plaintiffs, DIRECTV willfully failed
to maintain time records and other employment documentation to save payroll and other
costs (SAC, ¶ 63); by imposing its policies and practices to avoid state and federal
employment laws, DIRECTV willfully failed to pay minimum wage and overtime
compensation to plaintiffs (SAC, ¶ 63); to perpetuate these unlawful practices,
defendants willfully failed to keep accurate records of all hours worked by,
compensation paid to, and expenses incurred by, plaintiffs (SAC, ¶ 178); these
employment schemes have been challenged in court numerous times around the
country against DIRECTV, DirectSat and other HSP members of the Provider Network
(SAC, ¶ 179); and DIRECTV is currently a defendant in a lawsuit brought by the U.S.
Department of Labor in the Western District of Washington challenging virtually the
same systems challenged in the instant suit. Id.

Count II alleged that as to plaintiffs Finwall, Hanggi, Kiekbusch, Koziol, Schmidt,
Porisch and Yang, defendants violated Minn. Stat. § 181.722,[4] by misrepresenting the

---

[4]      Minn. Stat. § 181.722 provides in relevant part as follows:

**181.722. Misrepresentation of employment relationship prohibited**

> **Subdivision 1. Prohibition.** No employer shall misrepresent
> the nature of its employment relationship with its employees
> to any federal, state, or local government unit; to other
> employers; or to its employees. An employer misrepresents
> the nature of its employment relationship with its employees

nature of their employment relationship with plaintiffs by, among other things, misclassifying these plaintiffs as independent contractors. Id., ¶¶ 185, 187. The SAC alleged that as satellite system installers, plaintiffs fell within the definition of "construction worker" in Minn. Stat. § 179.254[5] and as a result, defendants were subject to the provisions of Minn. Stat. § 181.722. Id., ¶¶ 184, 185.

---

if it makes any statement regarding the nature of the relationship that the employer knows or has reason to know is untrue and if it fails to report individuals as employees when legally required to do so.

**Subd. 2. Agreements to misclassify prohibited.** No employer shall require or request any employee to enter into any agreement, or sign any document, that results in misclassification of the employee as an independent contractor or otherwise does not accurately reflect the employment relationship with the employer.

**Subd. 3. Determination of employment relationship.** For purposes of this section, the nature of an employment relationship is determined using the same tests and in the same manner as employee status is determined under the applicable workers' compensation and unemployment insurance program laws and rules.

**Subd. 4. Civil remedy.** A construction worker, as defined in section 179.254, who is not an independent contractor and has been injured by a violation of this section, may bring a civil action for damages against the violator. If the construction worker injured is an employee of the violator of this section, the employee's representative, as defined in section 179.01, subdivision 5, may bring a civil action for damages against the violator on behalf of the employee. The court may award attorney fees, costs, and disbursements to a construction worker recovering under this section.

\*\*\*

[5] Minn. Stat. § 179.254 is entitled "Construction workers insurance benefit funds; definitions." Minn. Stat. § 179.254, subd. 3 defines "construction worker" as:

any laborer or member of a trade who is employed in the building or construction industry and who is engaged in, but not limited to, any of the following occupations: carpenters,

III.    DEFENDANTS' MOTIONS TO DISMISS

Defendants moved to dismiss the SAC in lieu of answering.   In general, defendants argued that plaintiffs failed to plead the existence of an employment relationship between defendants and plaintiffs; failed to plead facts sufficient to support their minimum wage and overtime claims; and their claims were precluded, in whole or in part, by the two-year FLSA statute of limitations.   Defendants' Memorandum in Support of Motion to Dismiss ("Defs.' Mem.") [Docket No. 103], pp. 11-32.   As to the state law claim, defendants argued that Minn. Stat. § 181.722 simply did not apply to plaintiffs because they were not "construction workers" as defined by Minn. Stat. § 179.254, and in any event, these claims were barred in part by Minnesota's two-year limitations period governing claims seeking recovery of past wages, overtime or damages.   Id., pp. 34-36.   Defendants also submitted that Porisch's claims must be dismissed for those time periods he was working in Wisconsin, and Kiekbusch's FLSA claims against DIRECTV must be dismissed to prevent improper claims-splitting.   Id., pp. 37-39.

Plaintiffs opposed the motion, arguing that the SAC was adequate in all respects regarding their FLSA claims.   Plaintiffs' Memorandum in Opposition to Motion to Dismiss ("Pls.' Mem. in Opp.") [Docket No. 111], pp. 1-24.   Plaintiffs noted that in four related cases arising out of the same employment scheme, courts in the districts of Kansas, (Renteria-Camacho v. DIRECTV, Civ. No. 14-2529), Massachusetts,

_____

electricians, plumbers, bricklayers, masons, steamfitters, pipefitters, iron workers, sheet metal workers, cement finishers, laborers, operating engineers, lathers, plasterers, painters, pipe coverers, and glaziers.

(<u>Barbarosa v. DIRECTV</u>, Civ. No. 14-13896), Oregon, (<u>Berger v. DIRECTV</u>, Civ. No. 14-1661) and the Eastern District of Missouri, (<u>Arnold v. DIRECTV</u>, Civ. No. 10-352) had denied similar motions to dismiss.  <u>Id.</u>, pp. 2-3.  As to their state law claims, plaintiffs submitted that as satellite system installers, they should be treated as "construction workers" under Minn. Stat. § 179.254(3), plaintiffs are only asserting claims for work performed in Minnesota, and plaintiff Kiekbusch is not engaging in claim-splitting because he is not pursuing any claim in the <u>Arnold</u> case.  <u>Id.</u>, pp. 24-27.

## IV.  PLAINTIFFS' CONDITIONAL MOTION FOR TIME WITHIN WHICH TO SEEK LEAVE TO AMEND [DOCKET NO. 112]

Plaintiffs sought a 30-day window to file a motion for leave to amend if the Court granted defendants' motions to dismiss.  Plaintiffs' Conditional Motion for Time Within Which to Seek Leave to Amend Should Court Grant Defendants' Motions to Dismiss Plaintiffs' Second Amended Complaint, pp. 1-2 [Docket No. 112].  Defendants opposed this motion, contending that plaintiffs should have submitted a proposed Third Amended Complaint or provided some clear statement regarding the substance of any proposed amendment.  Defendants' Memorandum in Opposition, pp. 2-4 [Docket No. 115].  At the motion hearing, plaintiffs' counsel noted that their motion was made only out of an abundance of caution in the event the Court recommended that any part of the SAC be dismissed.  In other words, if any part of the SAC was to be dismissed because the allegations were insufficient to support plaintiffs' claims, it should be dismissed without prejudice to plaintiffs' ability to seek leave to file and serve a Third Amended Complaint to cure any deficiencies.  Plaintiffs did not submit a redlined version of the proposed Third Amended Complaint because they did not know what the Court might identify as defects in the SAC.

## V.   STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. In re Operation of Mo. River Sys. Litig., 418 F.3d 915, 917 (8th Cir. 2005) (citations omitted); see also Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).   In addition, "the court must resolve any ambiguities concerning the sufficiency of the plaintiffs' claims in favor of the plaintiffs, and give the plaintiffs the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint." Ossman v. Diana Corp., 825 F. Supp. 870, 880 (D. Minn. 1993) (internal quotation marks omitted) (quoting Retail Clerks Int'l Ass'n v. Schermerhorn, 373 U.S. 746, 753 n.6 (1963)).

Litigants also must properly plead their claims under Rule 8 of the Federal Rules of Civil Procedure and meet the principles articulated by the United States Supreme Court in Bell Atlantic Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009).   To satisfy Rule 8, Twombly and Iqbal, "a complaint need not contain 'detailed factual allegations,' . . . ." United States ex rel. Raynor v. National Rural Utils. Coop. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012) (quoting Twombly, 550 U.S. at 555).   However, "it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'" Id. (citation omitted).   The court is not bound to accept as true "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . or legal conclusions couched as factual allegations." McDonough v. Anoka Cty., 799 F.3d 931, 945 (8th Cir. 2015) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).   Accordingly, to "survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S., at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556).

"Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the claimed violations.  Twombly, 550 U.S. at 556.  "There is no requirement for direct evidence; the factual allegations may be circumstantial and 'need only be enough to nudge the claim 'across the line from conceivable to plausible.'" McDonough, 799 F.3d at 945 (quoting Cardigan Mountain Sch. v. New Hampshire Ins. Co., 787 F.3d 82, 88 (1st Cir. 2015) (quoting Twombly, 550 U.S. at 556)).  "Courts should consider whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct, because '[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 678, 682 (quoting Twombly, 550 U.S. at 557, 567 (brackets omitted)) (internal quotation marks omitted)).   "If the alternative explanations are not sufficiently convincing, however, the complaint states a plausible claim for relief, because '[f]erreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage.'" Id. (citing Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 458 (6th Cir. 2011)).

## VI.    DISCUSSION

### A.    Count I: Violation of the FLSA

Defendants' arguments in favor of dismissal of plaintiffs' FLSA claims are as follows: (1) plaintiffs failed to sufficiently allege that defendants controlled plaintiffs' work to establish that defendants were plaintiffs' employers; (2) the SAC failed to plead with requisite detail the facts necessary to support claims for overtime pay and a violation of minimum wage laws; (3) even if plaintiffs have satisfied the pleading standards governing FLSA claims, as to Hanggi, Finwall and Monroe, their specific allegations defeat any claims asserting a violation of minimum wage laws and failure to pay overtime; and (4) the SAC failed to plead sufficient facts to make out a claim of willfulness to save some of the claims from the two-year limitations bar.

For the reasons described below, the Court concludes that the SAC sufficiently alleged an FLSA violation and plaintiffs' allegations regarding willfulness were adequate to support a claim to extend the FLSA statute of limitations to three years.

### 1.    The SAC Sufficiently Alleges an Employer Relationship Between Plaintiffs, DIRECTV and DirectSat

Defendants contended that plaintiffs failed to plead the existence of an employment relationship with both defendants – a prerequisite for the application of the FLSA. Defs.' Mem., pp. 11-16. According to defendants, plaintiffs' claim that DIRECTV exerted significant control over the Providers, plaintiffs' employment and their work lives was insufficient because it was impossible to determine from the SAC whether plaintiffs were alleging that defendants were a joint employer with another (unnamed) entity, whether the other entities were the direct employer and defendants were joint employers, or whether defendants were plaintiffs' direct employers and the other entities

were joint employers of defendants.[6]  Id., p. 12.  Moreover, the SAC did not specifically allege that either defendant had the power to hire and fire, control work schedules, determine the rate and method of payment, or maintained employment records.  Id., pp. 13-14.  Because plaintiffs did not plead that they were direct employees of either defendant, they were required to plead facts that showed the interrelationship between defendants such that defendants and the other entities described in the SAC were joint employers.  But plaintiffs did not do that.  Id., p. 14.

Plaintiffs responded that the FLSA's definition of employer encompasses "any person acting directly or indirectly in the interest of any employer in relation to an employee."  Pls.' Mem. in Opp., p. 8 (citing 29 U.S.C. § 203(d)) (emphasis added in original).  Further, the FLSA contemplates that an individual can have more than one employer, each of whom is jointly and severally liable for violations of the Act.  Id., p. 9 (citing 29 C.F.R. § 791.2 (defining joint employment and describing situations in which it arises)).  To determine whether an employment relationship exists for the purposes of the FLSA, courts examine "the 'economic reality' of the circumstances bearing on whether the putative employee is economically dependent on the alleged employer."  Id., pp. 9-10 (citations omitted).  Under the "economic reality" test, an employment relationship is determined based on the presence of factors including: whether the alleged employer had the power to hire and fire plaintiff; supervised and controlled plaintiff's work schedules or conditions of employment; determined the rate and method

---

[6]     At the motion hearing, plaintiffs' counsel confirmed that the "joint employer" relationship being alleged was between DIRECTV and DirectSat, not between DIRECTV and the HSPs and, in fact, DIRECTV and DirectSat were plaintiffs' direct employers.

of payment to plaintiff; and maintained plaintiff's employment records. Id. 9 (citations omitted). Plaintiffs contended that they adequately described in the SAC the policies and procedures set forth in the Provider Agreements between DIRECTV and DirectSat, the relationship among plaintiffs, DIRECTV and DirectSat, and the relationship between DIRECTV and DirectSat. Id., p. 10-11 (citing SAC, ¶¶ 3, 29, 34, 35, 47, 49, 50, 62-64). Further, the SAC described how DIRECTV controlled each level of the Provider Network through Provider Agreements and that those agreements, including an agreement with DirectSat, contained the policies and procedures governing the plaintiffs' work. Id., p. 12 (citing SAC ¶¶ 23, 29, 30, 34-37, 47, 49, 50). The SAC also described how these policies were enforced at all levels and how the Provider Network disassociated defendants from the technicians to avoid the FLSA and Minnesota law. Id. (citing SAC, ¶¶ 1, 25, 29, 34-36, 44, 62-65).

Further, the SAC alleged the various ways in which DIRECTV exerted complete control over plaintiffs' work, including: dictating that they wear DIRECTV shirts, show customers a DIRECTV identification card and complete DIRECTV's training; follow daily work schedules that were transmitted to them by DIRECTV's dispatching systems; complete their work in the order prescribed by DIRECTV; adhere to DIRECTV's mandated methods and standards of installation to ensure that the installations met DIRECTV's policies and procedures; upon completion of a job, check in and activate the receivers with DIRECTV; DIRECTV, along with DirectSat personnel, conducted quality control to determine if plaintiffs' work merited compensation; and DIRECTV effectively had the power to control hiring and firing decisions. Id., pp. 12-13 (citing SAC, ¶¶ 30, 32, 37, 38, 39-41, 42, 50, 52, 53-55, 56, 57, 58, 59). In light of the degree of control

exerted by DIRECTV, plaintiffs alleged that "[e]ach technician's essential job duties are virtually identical no matter where performed and no matter which intermediary the technician is ostensibly working for." Id., p. 13 (quoting SAC, ¶ 38).

As for DirectSat, plaintiffs contended that the SAC specifically described the functions DirectSat performed with respect to the technicians, as it was required to do by its contract with DIRECTV, such as passing along scheduling, providing supervision, implementing and enforcing qualification requirements for hiring and technical requirements for job performance; maintaining personnel files (dubbed "contractor files"); and maintaining facilities for equipment and training. Id., p. 13 (citing SAC, ¶¶ 30-36).

In sum, plaintiffs contended that consistent with the legal elements of the claims and the governing case law, and notwithstanding the presence of other entities, they had alleged DIRECTV had employed them; they had "alleged the nature of the relationship between DIRECTV and the entities, including DirectSat, that also acted as their employers;" and they had alleged "many indicia of control exercised by [d]efendants over every aspect of their daily work lives that, as a matter of economic reality, renders it plausible" that defendants jointly employed them. Id., pp. 13-14.

At the motion hearing, plaintiffs' counsel informed the Court that thirteen other district courts had denied defendants' motions to dismiss complaints based on similar allegations in whole or in part. This Court directed plaintiffs' counsel to provide all of the

decisions to the Court following the hearing, which counsel did do.  See Plaintiffs' Notice

of Supplemental Authority [Docket No. 128].[7]

The existence of an employer-employee relationship is a prerequisite to asserting

a claim under the FLSA.  Childress v. Ozark Delivery of Mo., LLC, 95 F. Supp. 3d 1130,

1138 (W.D. Mo. 2015).  Under the FLSA, an employer is "any person acting directly or

indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C. §

203(d) (emphasis added).  An "employee" is "any person employed by an employer . . .

."  29 U.S.C. § 203(e)(1).  The FLSA recognizes that "[a]n employee may have multiple

employers that are simultaneously liable under the FLSA where the evidence shows

that separate persons or entities exercise some level of control over the employee."

Childress, 95 F.Supp.3d at 1138 (citing 29 C.F.R. § 791.2);[8] see also Saunders v. Ace

---

[7]     On July 15, 2015, (after briefing on the motion but before the hearing), defendants' counsel contacted this Court requesting permission to file an order from the District of Maryland in Hall v. DIRECTV and Lewis v. DIRECTV (collectively, "Hall") dismissing plaintiffs' FLSA and state law claims, on similar grounds to the grounds defendants were pursuing in the instant motion.  Letter to Magistrate Judge dated July 15, 2015 [Docket No. 129-1].  After the motion hearing, on September 24, 2015, defendants' counsel submitted a Notice of Supplemental Authority attaching an order from the Northern District of Illinois in Anaya et.al. v. DIRECTV, LLC, et.al., dismissing plaintiffs' FLSA and Illinois state law claims against DIRECTV and DirectSat.  [Docket No. 129].  On September 29, 2015, plaintiffs' counsel filed a Second Notice of Supplemental Authority, [Docket No. 130], attaching all of the orders issued in all related actions across the country.  Plaintiffs made this second supplemental filing in response to defendants' submission of the Anaya order.  See Plaintiffs' Second Notice of Supplemental Filing, p. 1.  The Court has reviewed all of these decisions.

[8]     29 C.F.R. § 791.2(b) in relevant part provides:

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as: . . . (2) Where one employer is acting directly or indirectly in the interest of the other employer (or

Mortg. Funding, Inc., Civ. No. 05-1437 (DWF/SRN), 2007 WL 4165294, at *4 (D. Minn. Nov. 16, 2007) ("There may be multiple 'employers' who are simultaneously liable for compliance with the FLSA.") (citing Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir.1991)).  Whether an entity is an "employer" under the FLSA is typically a question of law.  Childress, 95 F. Supp. 3d at 1139 (citations omitted); Saunders, 2007 WL 4165294, at *4 ("Whether a party is an employer is a legal determination[.]").

As a result of the FLSA's broad definitions of "employer" and "employee,"[9] "[t]hese statutory definitions serve only as a starting point in an FLSA analysis, as '[t]he Supreme Court has suggested that 'employee' is expansively defined under the FLSA and has stated that courts should determine whether an individual is an 'employee' in light of the 'economic reality' of the situation under the totality of the circumstances, rather than rely on technical labels." Martin v. Benson, 827 F. Supp. 2d 1022, 1025 (D. Minn. 2011) (citing Barnett v. Young Men's Christian Assn., No. 98–3625, 1999 WL 110547, at *1 (8th Cir. Mar. 4, 1999) (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 325–26 (1992) and Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33

---

employers) in relation to the employee; or (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

[9]    "While the FLSA, . . . defines an "employee" to include 'any individual employed by an employer,' it defines the verb 'employ' expansively to mean 'suffer or permit to work.' 52 Stat. 1060, § 3, codified at 29 U.S.C. §§ 203(e), (g). This latter definition, whose striking breadth we have previously noted, stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326, (1992) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 728 (1947)).

(1961)); see also Blair v. Willis, 420 F.3d 823, 829 (8th Cir. 2005) (noting that courts generally look to the economic realities of an alleged employment situation, not technical concepts).  The economic reality test also applies to determine if an entity is a joint employer under the FLSA.  Roeder v. DIRECTV, --F. Supp. 3d--, 2015 WL 5603050, at *5 (D. N.D. Iowa, Sept. 22, 2015) (citations omitted).

In applying the economic reality test to determine if an entity is a joint employer, the federal courts generally examine who has operating control over the purported employees, and asks whether the alleged employer: (1) possessed the power to hire and fire the employee; (2) supervised or controlled the employee's work schedule or conditions of employment; (3) determined the rate or method of payment and (4) maintained employment records.  Id. (citations omitted); see also Ash v. Anderson Merch., LLC, 799 F.3d 957, 961 (8th Cir. 2015), cert. denied, 2016 WL 100393 (U.S. Jan. 11, 2016) (["Plaintiffs'] complaint does not include any facts describing the 'economic reality' of their employment, such as their alleged employers' right to control the nature and quality of their work, the employers' right to hire or fire, or the source of compensation for their work.").  "None of these factors alone is dispositive; instead, courts look to the totality-of-the-circumstances."  Roeder, 2015 WL 5603050, at *5 (citations omitted); see also Childress, 95 F. Supp. 3d at 1139 ("These factors are not exhaustive and no one factor is dispositive."); Saunders, 2007 WL 4165294, at *4 ("No single economic factor is dispositive") (citations omitted).

Applying the four factors to the facts alleged in the SAC, this Court finds that plaintiffs have alleged sufficient facts to support their claim that DIRECTV and DirectSat were their joint employers under the FLSA.

a.   Power to Hire and Fire

The SAC alleged that DIRECTV controlled which technicians were hired by setting the standards and qualifications for their employment and through pre-screening and background checks and special certification; DirectSat implemented and enforced these qualifications; DirectSat had the power to enter into and terminate contracts with the technicians working under its aegis; and DIRECTV could effectively terminate any technician by withholding work.  SAC, ¶¶ 30, 32, 56, 58.  Thus, as to the first factor of the economic reality test, plaintiffs have sufficiently alleged that DIRECTV and DirectSat had the power to hire and fire plaintiffs.[10]

---

[10]    The district court in Hall et. al. v. DIRECTV, (submitted by defendants as supplemental authority, along with the Consolidated Amended Complaint ("CAC") filed in Hall) granted defendants' motion to dismiss, stating that the "ultimate test" of employment is the ability to hire and fire and plaintiffs had not alleged that DIRECTV had such power. Hall v. DIRECTV, LLC, Civ. No. 14-2355, 2015 WL 4064692, at *2 (D. Md. June 30, 2015), appeal docketed, No. 15-1857 (4th Cir. Aug. 3, 2015).  The Court disagrees that hiring and firing is the "ultimate test," as the factors under which economic realities are examined vary based on particular circumstances.  See e.g., Le v. Regency Corp., 957 F. Supp. 2d 1079, 1089-90 (D. Minn. 2013) ("The economic realities test is not mechanical or formal in its application. Instead, 'it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer.'") (quoting Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998)); see also Roeder, 2015 WL 56030, at *5 ("None of these factors alone is dispositive; instead, courts look to the totality-of-the-circumstances."); Saunders, 2007 WL 4165294, at *4 ("No single economic factor is dispositive") (citations omitted).  Moreover, while the Hall court had before it the same allegations that this Court has relied upon to find that plaintiffs have stated a plausible claim that both DIRECTV and DirectSat engaged in the hiring and firing of technicians, (compare SAC, ¶¶ 30, 32, 58 with Hall CAC, ¶¶ 23, 25, 51, 53), the Hall court did not list, much less consider, any of these allegations in its description of the facts alleged in the CAC.  Hall, 2015 WL 4064692, at *1.  The Court also notes that contrary to Hall, in Perez v. Lantern Light Corp., on cross-motions for summary judgment, the district court found that DIRECTV "unquestionably" played a role in hiring and firing installers, citing DIRECTV's establishment of eligibility requirements for technicians, the requirement that installers obtain certification, its ability to withhold work orders (effectively constructively discharging the installers), and its control over technicians' performance evaluations.  2015 WL 3451268, at *5-7 (W.D. Wash. May 29, 2015).

b.     <u>Supervision and Control of Work Schedules and Conditions of Employment</u>

The SAC set forth detailed facts describing the supervision and control DIRECTV and DirectSat exerted over the plaintiffs' work schedules and conditions of employment. Specifically, plaintiffs alleged that DirectSat controlled the warehouses and other facilities where the technicians picked up DIRECTV's equipment and underwent the training required by DIRECTV; DIRECTV dictated installation procedures, policies, and performance standards, which DirectSat implemented, monitored and enforced; DIRECTV required plaintiffs to review its training materials, pass its pre-screening and background checks and obtain its certification; DIRECTV required plaintiffs to hold themselves out as DIRECTV's agents by directing them to wear DIRECTV-branded clothing, carry a DIRECTV identification card, and place a DIRECTV insignia on their vehicles; DIRECTV assigned work through its centralized computer software and dispatching systems, and required plaintiffs to "check in" on arriving at a job and on completion of a job; DirectSat communicated the scheduling from DIRECTV and supervised the technicians; and DirectSat maintained the equivalent of personnel file on each technician, which were regulated and audited by DIRECTV. SAC, ¶¶ 30, 31, 33, 38, 39, 41, 42, 52-55. Plaintiffs have sufficiently pled facts to support the second factor of the economic reality test.

c.     <u>Determination of Rate and Method Of Payment</u>

As to the third factor, determination of the rate and method of payment, the SAC alleged that DIRECTV controlled how and what plaintiffs were paid by administration of its piece-rate compensation system through its Providers Network (including DirectSat), by determining whether plaintiffs' work merited compensation at all, and by defining

compensable and non-compensable tasks. SAC, ¶¶ 49, 51, 71-73. The SAC additionally alleged that plaintiffs' compensation was reduced as a result of DIRECTV's system of chargebacks and its policy of not reimbursing plaintiffs for business expenses, such as their travel expenses and purchases of supplies needed for their work. Id., ¶¶ 75, 76. These allegations are sufficient to support the third factor of the economic reality test.

d.     Maintenance of Employment Records

As to the fourth factor, maintenance of employment records, the SAC alleged that DirectSat maintained a "contractor" file akin to personnel files for each technician working as a 1099 subcontractor or alleged "independent contractor," and that DIRECTV regulated and monitored the files. Id., ¶ 31. For those plaintiffs who worked for DirectSat, this factor weighs in favor of finding that both defendants were their employer. The SAC is silent as to the plaintiffs who were not allegedly employed by DirectSat (Benjegerdes, Nord, Jerry). The Court treated this factor as neutral vis-à-vis Benjegerdes, Nord and Jerry.[11]

---

[11]     In Perez v. Lantern Light Corp., on cross motions for summary judgment, the court analyzed the same four factors in a suit brought by the Secretary of Department of Labor on behalf of broadcast satellite television installers against DIRECTV. 2015 WL 3451268. When analyzing the fourth factor for determining whether DIRECTV was a joint employer, the court found it met the requirements of this factor based on the following:

> DirecTV's recordkeeping accomplished the purposes of establishing working conditions (by assigning Tech ID numbers to work orders), payroll (tracking completed work orders) and evaluating employee performance (compiling data into organized performance metrics). Evidence in the record shows DirecTV used data compiled over time ("ongoing consecutive problems") to "discipline" AIS Installers by refusing to issue work orders. Dkts. # 121, Ex. 7

Accepting as true the allegations in the SAC, and viewing the totality of the circumstances of plaintiffs' alleged employment by both defendants, the Court concludes that the SAC surpasses the hurdle of plausibility and plaintiffs' FLSA claims should be allowed to proceed against both DIRECTV and DirectSat. [12]

---

at 56:22–59:3 and # 124, Ex. CC (filed under seal ) ("Can anyone tell me if those techs are one of the two techs I put on discipline or 'do not route?' ")

Id., at *12.  While here, given the posture of the case, no record has been developed, the Court does note that plaintiffs have alleged: "DIRECTV used a database program known as SIEBEL to coordinate the assignment of particular work orders to technicians using each technician's unique 'Tech ID Number;'" "Each technician's unique 'Tech ID Number' connects them to a HSP;" "As described in detail above, DIRECTV, through its SIEBEL system, assigns detailed work schedules to Plaintiffs. Through this system, DIRECTV and the Providers effectively control who continues to perform their work, and can effectively terminate any technician by simply ceasing to issue work to those technicians." SAC, ¶¶ 39, 40, 58.  These allegations may very well lead to the type of evidence that was garnered in Perez v. Lantern Light to make out the fourth factor against both defendants.

[12]    Both parties relied on the four-factor test this Court used to address DIRECTV's and DirectSat's status vis-à-vis plaintiffs.  Defs.'s Mem., pp. 12-15; Pls.' Mem., pp. 9-15. However, the Court notes that some courts within and outside this District (as discussed infra) have applied a six-factor test to determine if an individual is an employee under the FLSA or if an entity is an employer (or joint employer).  See e.g., Lindsay v. Clear Wireless LLC, No. Civ. 13-834 (DSD/FLN), 2014 WL3573956, at *2 (D. Minn. July 18, 2014) (applied both tests); Le, 957 F. Supp. 2d at 1079 (applied six-factor test); Meseck v. TAK Comms., Inc., Civ. No. 10-965 (JRT/AJB), 2011 WL 1190579, at *5 (D. Minn. Mar. 28, 2011) (applied six-factor test); McDonald v. JP Mktg. Associates, LLC, No. Civ. 06-4328 (ADM/AJB), 2007 WL 1114159, at *4-5 (D. Minn. Apr. 13, 2007) (applied both tests); Catani v. Chiodi, Civ. No. 00-1559 (DWF/RLE), 2001 WL 920025, at *3 (D. Minn. Aug. 13, 2001) (applied both tests).  These factors include: (1) the degree of control over the manner in which the work is performed; (2) the worker's opportunity for profit or loss depending on his managerial skill; (3) the worker's investment in equipment or materials, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree or permanence of the working relationship; and (6) whether the service rendered is an integral part of the employer's business.  Catani, 2001 WL 920025, at *3.  Applying the six-factor test, the Court reaches the same conclusion as it did applying the four-factor test.  For example, as to the first factor, the SAC alleged sufficient facts to establish that defendants exerted a high degree of control over the plaintiffs' work, including the manner in which they worked and whether plaintiffs would

This conclusion is borne out by numerous other courts who have considered the question of whether DIRECTV, DirectSat (or other comparable HSPs) employ satellite installation technicians such as plaintiffs, and have denied DIRECTV's motions to dismiss.  See Dowd, 2016 WL 28866, at *2-8 (applying six-factor test and denying DIRECTV's and DirectSat's motions to dismiss on similar allegations as instant case); Roeder, 2015 WL 5603050, at *7 (applying four-factor test and denying DIRECTV's motion to dismiss in its entirety, and finding plaintiffs adequately pled an employer-employee relationship with plaintiffs based on similar allegations as instant case); Mabry et. al. v. DIRECTV et. al., Civ. No. 3:14-698, 2015 WL 5554023, at *3 (W.D. Ky Sept. 21, 2015) (applying six-factor test and denying DIRECTV's and Multiband Corporation's

---

work at all.  As to the second factor, plaintiffs alleged that defendants completely controlled their income through their systems of piece-rate pay, chargebacks, unreimbursed business expenses, and failure to pay for travel time.  With respect to the third factor, plaintiffs claimed they were required to wear uniforms issued by the defendants, drive vehicles branded by defendants, and install defendants' equipment, indicating that it was defendants, not plaintiffs who invested in the equipment plaintiffs were installing.  As to the fourth factor, plaintiffs alleged that they were required to attend training designed and provided by defendants and perform their work according to DIRECTV's standards, policies and procedures.  These allegations indicate that plaintiffs' skills were provided by defendants and that plaintiffs had very little autonomy and discretion regarding the skill required to perform their work.  As to the fifth factor, plaintiffs alleged an on-going relationship with defendants and that they worked more than full-time for defendants.  In other words, this was not a discrete or an on-again, off-again relationship; it was permanent, full-time engagement.  Lastly, reading the SAC as a whole, it was clear that as members of the corps of service technicians responsible for installing and replacing DIRECTV's satellite television service, plaintiffs alleged the integral role their services played in defendants' business.  For these reasons, even if the six-factor test was applied, it too weighed in favor of deeming plaintiffs the employees of defendant.  See, e.g., Dowd v. DIRECTV, LLC, Civ. No. 14-14018, 2016 WL 28866, at *2-8 (E.D. Mich. Jan. 4, 2016); Collins et. al. v. DIRECTV et. al., Civ. No. 14-635, N.D. Ok., Order dated July 8, 2015 (found at Docket No. 130-9 in the instant case) (applying a five-factor test similar to the six-factor test and concluding that plaintiffs plausibly alleged an employment relationship with DIRECTV, based on similar facts).

(a member of DIRECTV's Provider Network) motion to dismiss, and stating "Plaintiffs allege sufficient facts demonstrating an employment relationship between DIRECTV and Plaintiffs under the FLSA."); Field et. al. v. DIRECTV et. al., Civ. No. 14-4427, E.D. Pa. Order dated August 21, 2015 (found at Docket No. 130-17 in the instant case) (applying four-factor test and denying in part DIRECTV's and MasTec's (a member of DIRECTV's Provider Network) motions to dismiss on the basis of lack of employer-employee relationship and based on similar allegations as instant case, and noting other courts that have reached the same conclusion); McCaffery et. al. v. DIRECTV et. al., Civ. No. 14-877, E.D. Wis., Decision and Order dated July 27, 2015 (found at Docket No. 130-16 in the instant case) (applying six-factor test and denying DIRECTV's and DirectSat's motions to dismiss in part, and finding plaintiffs pled an employer-employee relationship between DIRECTV and plaintiffs based on similar allegations as instant case); Collins (applying a five-factor test similar to the six-factor test and denying DIRECTV's motion to dismiss, and finding that plaintiffs plausibly alleged an employer-employee relationship between DIRECTV and plaintiffs based on similar allegations as instant case); Roslov et. al. v. DIRECTV et. al., Civ. No. 4:14-616, E.D. Ark., Order dated June 9, 2015 (found at Docket No. 130-15 in the instant case) (denying DIRECTV's and Multiband's motions to dismiss and finding that plaintiffs adequately pled employer-employee relationship between DIRECTV and defendants); Chesley et. al. v. DIRECTV et. al., Civ. No. 14-468, 2015 WL 3549129, at *4 (D. NH June 8, 2015) (applying four-factor test and denying in part DIRECTV's and Multiband's motions to dismiss based on similar allegations as instant case, and stating that the court was "join[ing] other courts that have denied motions to dismiss brought by DIRECTV in

similar cases.") (citations omitted); <u>Doucette et. al. v. DIRECTV et. al.</u>, Civ. No. 2:154-2800, 2015 WL 2373271, at *2-5 (W.D. Tenn. May 18, 2015) (applying six-factor test and denying DIRECTV's and Multiband's motions to dismiss, finding allegations regarding the control DIRECTV exerted over plaintiffs sufficient to show an employer-employee relationship); <u>Alston et. al v. DIRECTV et. al.</u>, Civ. No. 3:14-4093, 2015 WL 2451219, at *2-4 (D. SC May 22, 2015) (denying DIRECTV's and MasTec's motion to dismiss, and determining that plaintiffs' complaint was sufficient to support an FLSA claim in light of allegations regarding the exercise of control over the nature, structure, and economics of the employment relationship with plaintiffs); <u>Amponsah et. al. v. DIRECTV et. al.</u>, Civ. No. 1:14-3314, N.D. Ga., Order dated April 16, 2015 (found at Docket No. 130-4 in the instant case) (denying DIRECTV's, Multiband's and MasTec's motions to dismiss in part, finding that "plaintiffs pled sufficient facts, that if true, raise a plausible inference that DIRECTV was their ostensible employer" based on allegations similar to the instant case);[13] <u>Renteria-Camacho v. DIRECTV et. al.</u>, Civ. No. 14-2529, 2015 WL 1399707, at *1-3 (D. Kan. March 26, 2015) (applying six-factor test, denying motion to dismiss and finding that plaintiffs adequately pled an employer-employee relationship); <u>Berger et. al. v. DIRECTV et.al.</u>, Civ. No. 3:14-1661, D. Or., Findings and Recommendation dated March 6, 2015 (found at Docket No. 130-7 in the instant case) (applying four-factor test and finding allegations regarding degree of control exerted by

---

[13]     The court in <u>Amponsah</u> found the Complaint deficient regarding the allegations that Multiband and MasTec were plaintiffs' joint employers with DIRECTV, apparently because the Complaint only stated that Multiband and MasTec hired technicians and administered payroll. <u>Amponsah</u> Order, pp. 12, 19-20. Plaintiffs in the instant case argued that the SAC provided exactly the sort of detail the <u>Amponsah</u> court found lacking. Pls.' Mem., p. 13, n.5.

DIRECTV over plaintiffs' work sufficient to support a claim under the FLSA and to defeat motion to dismiss), Order adopting Findings and Recommendation, 2015 WL 179996 (D. Or. April 16, 2015).

## 2.    Overtime and Minimum Wage Claims

### a.    Overtime Claims

Defendants contended that statements that plaintiffs "regularly" worked in excess of 40 hours per week, but were not paid overtime, did not meet the standards of Rule 8, Iqbal and Twombly.  Instead, plaintiffs relied on generalized statements about the length and frequency of their unpaid work and failed to identify any single workweek in which any of the plaintiffs worked in excess of 40 hours per week, but were not paid overtime. Defs.' Mem., pp. 19-21.  Defendants cited Landers v. Quality Comms., Inc., 771 F.3d 638 (9th Cir. 2014) in support of their contention that plaintiffs' FLSA overtime claims were subject to dismissal for failure to meet Rule 8 standards.  Id., pp. 16, 20-21.  In Landers, the Ninth Circuit affirmed dismissal of an FLSA complaint, concluding that the plaintiff had offered only generalized allegations regarding violations of the FLSA and, as a result, failed to state a plausible claim for relief under the statute.  771 F.3d at 646. Defendants argued that plaintiffs' claims in the instant case "fare[d] no better."  Defs.' Mem., p. 20.  The crux of defendants' argument was that "no Plaintiff pled sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that he worked more than forty hours in a given week."  Id., p. 19.

In response, plaintiffs distinguished their allegations in the SAC from allegations in "off-the-clock" cases cited by defendants, in which those courts were critical of the lack of detail provided to support unpaid overtime allegations, leaving defendants to

guess at the time periods covered in the complaint.  Pls' Mem. in Opp., pp. 16-17 (citing

Defs. Mem., pp. 17-20[14]).  Unlike those cases, plaintiffs had alleged that they were paid

pursuant to a piece-rate system that failed to compensate them for all of the hours they

worked and they "always worked more than forty hours per week;" therefore,

defendants were not left to speculate about when plaintiffs contended they were unpaid.

Id. (citing Lucero v. Leona's Pizzeria, Inc., Civ. No. 14-5612, 2015 WL 191176, at *1-2

(N.D. Ill. Jan. 13, 2015).  Moreover, each plaintiff estimated the length of their

workweeks, the amount of overtime they worked per week, and the source and amount

of unlawful pay deductions (chargebacks and unreimbursed business expenses) they

incurred per week.   Id., p. 17.   The SAC further alleged that when working as

"independent contractors," plaintiffs did not receive overtime pay for work in excess of

40 hours per week, and when working as W-2 employees, their overtime was

miscalculated.  Id.

Plaintiffs further contended that Landers had no application.  Id., pp. 16-17.  In

Landers, the Ninth Circuit noted that in an FLSA case, the plaintiff should estimate the

length of her or his average workweek, the average rate of pay, amount of overtime

owned, "or any other facts that will permit the court to find plausibility."  Id., p. 17

(quoting Landers, 771 F.3d at 645).  Plaintiffs submitted that each of them provided the

specificity required by Landers by describing the lengths of their workweeks, the amount

of overtime they worked per week, and the sources of unlawful deductions from their

---

[14]     Plaintiffs cited the page numbers assigned through the Court's CM/ECF system
rather than the actual pages numbers of defendants' brief.  The Court has corrected
these citations to facilitate the reader's ability to locate the references in the briefs, and
throughout this Report and Recommendation, has referred to the actual page numbers
on the briefs, not the CM/ECF page numbers.

pay, including chargebacks and failure to reimburse business expenses. Id. (citing SAC, ¶¶ 88-90, 94-96, 100-102, 106-108, 112-114, 118-120, 124-126, 130-132, 136-138, 142-144, 148-150, 154-156, 160-162, 166-168). These allegations are sufficient to support an FLSA claim based misclassification. Id., p. 18 (citing Arnold v. DIRECTV, Civ. No. 10-352, 2011 WL 839636, at *7 (E.D. Mo., Mar. 7, 2011) (denying defendants' joint motion to dismiss and stating that "Plaintiff[s] did more than merely state a legal conclusion that they were not paid minimum wage or for overtime as required. Rather, they set forth factual allegations—such as Defendants' alleged policies of not compensating Plaintiffs for the performance [sic] requiring technicians to attend meetings, and of imposing 'charge backs.'").

Under the FLSA, an employer may not employ a person "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Where an employer violates this provision, the FLSA permits an employee to bring a private cause of action for the amount of unpaid overtime pay and an additional equal amount as liquidated damages. 29 U.S.C. § 216(b).

The Eighth Circuit has not addressed the pleading requirements for a complaint for FLSA overtime violations in the post-Iqbal and Twombly era. Shoots v. iQuor Holdings US, Inc., Civ. No. 15-563 (SRN/SER), 2015 WL 6150862, at *14 (D. Minn. Oct. 19, 2015). The court in Shoots noted that there is disagreement among the district courts within the Eighth Circuit regarding the degree of detail needed when alleging an FLSA overtime violation. Id. (comparing Arnold, 2011 WL 839636, at *7 (based on

allegations similar to those stated in the SAC, the court found that plaintiffs sufficiently pleaded FLSA overtime and minimum wage claims to survive a motion to dismiss even though the complaint did not include specific hours worked by plaintiffs) with Bailey v. Border Foods, Inc., Civ. No. 09-1230 (RHK/AJB), 2009 WL 3248305, at *2 (D. Minn. Oct. 6, 2009) (dismissing FLSA minimum wage claim where plaintiffs did not identify their hourly pay rates, amount of reimbursements, and amounts expended in making deliveries, among other things[15])).  The Shoots court stated:

> While there is certainly authority, such as Bailey, requiring a FLSA plaintiff to include details such as hourly rates in the complaint, the Court finds that the better approach is that applied by our sister court in Arnold.  As in Arnold, the Court finds that the FAC does "more than merely state a legal conclusion that [Plaintiffs] were not paid ... for overtime as required."

Id. (citing Arnold, 2011 WL 839636, at *7).

This Court reaches the same conclusion.  Plaintiffs alleged that "in virtually every workweek, [they] worked more than 40 hours per week for DIRECTV;" "the policy and practice of imposing 'chargebacks,' failing to compensate [them] for all hours worked, and failing to reimburse [their] necessary business expenses resulted in [them] routinely working more than forty hours . . . ," for which they were not paid an overtime premium. SAC, ¶¶ 78-80.  Further, each plaintiff provide an estimate of the average number of hours they worked in a given week and the hours for which they were not paid for non-compensable work in excess of forty hours.  SAC, ¶¶ 86-169.  Iqbal, Twombly and Rule 8 do not require more.

---

[15]    In Bailey, "the SAC simply provides the conclusory statement that '[a]s a result of the travel expenses incurred, Plaintiffs ... were systematically deprived of the minimum wage.' (SAC ¶ 21)."  2009 WL 3248305, at *2.

33

Defendants' reliance on <u>Landers</u> is misplaced.  After observing that "most (if not all) of the detailed information concerning a plaintiff-employee's compensation and schedule is in the control of the defendants," the Ninth Circuit stated that "[w]e further agree with our sister circuits that, at a minimum, a plaintiff asserting a violation of the FLSA overtime provisions must allege that she worked more than forty hours in a given workweek without being compensated for the hours worked in excess of forty during that week."  <u>Landers</u>, 771 F.3d at 645.  At the conclusion of the opinion, the Ninth Circuit explained: "[w]e decline to impose a requirement that a plaintiff alleging failure to pay minimum wages or overtime wages must approximate the number of hours worked without compensation.  However, at a minimum the plaintiff must allege at least one workweek when he worked in excess of forty hours and was not paid for the excess hours in that workweek, or was not paid minimum wages."  <u>Id.</u> at 646.

After <u>Landers</u>, the Ninth Circuit again addressed the adequacy of allegations made to assert an overtime wage claims.  <u>See</u> <u>Boon v. Canon Bus. Solutions, Inc.</u>, 592 Fed. Appx. 631 (9th Cir. 2015).  The district court had dismissed Boon's complaint against his former employer, finding that he failed to state his unpaid wages and overtime claims[16] with specificity.  <u>Id.</u> at 632.  The Ninth Circuit reversed, finding that <u>Landers</u>' holding that "detailed factual allegations regarding the number of overtime hours worked are not required to state a plausible claim," was inconsistent with the

---

[16]    Boon did not bring his lawsuit under the FLSA, but under various provisions of the California Code.  <u>Boon v. Canon</u>, Civ. No. 2:11-8206, Second Amended Complaint [Docket No. 42].  Boon alleged that Canon penalized him by imposing callbacks and non-compensable tasks on him, required him to do work at home, and "regularly required [him] to work more than eight hours per day and more than forty hours per workweek."  <u>Id.</u>, ¶¶ 16-22.

district court's dismissal of the complaint based on plaintiff's failure to estimate "how much uncompensated time was [worked], how often, and at what rate." Id.

In any event, Landers does not assist defendants. First, it is not controlling. See Shoots, 2015 WL 6150862, at *15. Second, if Landers stands for the proposition that plaintiffs must allege at least one workweek when they worked in excess of forty hours and were not paid for the excess hours in that workweek, plaintiffs did exactly that. See SAC, ¶¶ 87, 90, 93, 94, 96, 99, 102, 105, 108, 111, 114, 117, 120, 123, 126, 129, 132, 135, 138, 141, 144, 147, 150, 153, 155, 159, 162, 165, 168.   Indeed, plaintiffs alleged that "in virtually every workweek, [they] worked more than 40 hours per week for DIRECTV;" and "the policy and practice of imposing 'chargebacks,' failing to compensate [them] for all hours worked, and failing to reimburse [their] necessary business expenses resulted in [them] routinely working more than forty hours in a work week while being denied overtime pay …" Id., ¶¶ 78-80 (emphasis added).

As the court in Roeder explained:

> Moreover, even if the Eighth Circuit Court of Appeals were to adopt Landers's pleading requirements, it would not impact this case. In Landers, plaintiff only made a general allegation that he was subjected to a piecework wage system in which he worked more than forty hours per week without being paid for overtime and that if he was paid some overtime, it was less than the law required. See Landers, 771 F.3d at 640. There was no allegation identifying any particular week when the plaintiff had worked more than forty hours. Thus, the defendant was left to guess at what time periods were covered by the plaintiff's allegations. [Plaintiffs] do not assert the same or a similar type of unpaid-overtime case as the plaintiff in Landers. [Plaintiffs] allege that they were misclassified as exempt from the requirement to pay time-and-one-half for overtime. [Plaintiffs] allege that they always worked more than forty hours per week. Thus, unlike the defendant in Landers, DIRECTV is not left to guess when

> [Plaintiffs] contend they was underpaid: they allege that they
> were underpaid for every week they worked for DIRECTV.

2015 WL 5603050, at *8;

The Court finds that plaintiffs have alleged sufficient facts to proceed with their

overtime claims.

b.    Minimum Wage Claims

Defendants contended that plaintiffs' assertions that they were subjected to a

wage rate less than the federal minimum wage "is a more label or conclusion which

cannot be considered when determining whether Plaintiffs' have stated a claim."  Defs.'

Mem., p. 21.  According to defendants, plaintiffs committed a fatal pleading error by (1)

failing to state how many hours they worked for which they were not compensated in

specific workweeks; (2) what their rate of pay was; (3) what amount of business

expenses they incurred for which they were not reimbursed in specific workweeks; and

(4) the number of chargebacks that were allegedly deducted from their pay in specific

workweeks.  Id., pp. 21-22 (citing Bailey, 2009 WL 3248305, at *2; LePage v. Blue

Cross & Blue Shield of Minn., Civ. No. 08-584 (RHK/JSM), 2008 WL 2570815, at *2 (D.

Minn. June 25, 2008)).[17]

Plaintiffs submitted that they did, in fact, provide estimates of the hours they

worked and the amounts deducted from their pay in a given workweek and that the

detail they provided was sufficient to survive a motion to dismiss.  Pls.' Mem., pp. 17-19

---

[17]    As stated previously, in Bailey, "the SAC simply provides the conclusory
statement that '[a]s a result of the travel expenses incurred, Plaintiffs ... were
systematically deprived of the minimum wage.'"  2009 WL 3248305, at *2 (citations
omitted).  In LePage, plaintiffs only alleged that "Blue Cross permitted them 'to work
hours each week without minimum wage compensation' which violated the FLSA's
minimum-wage requirements." 2008 WL 2570815, at *2 (citations omitted).

(citing <u>Arnold</u>, 2011 WL 839636, at *7).  In <u>Arnold</u>, the district court rejected DIRECTV's argument that plaintiffs' minimum wage claims failed because they were not sufficiently detailed and concluded that "[p]laintiff[s] did more than merely state a legal conclusion that they were not paid minimum wage or for overtime as required.  Rather, they set forth factual allegations—such as Defendants' alleged policies of not compensating Plaintiffs for the performance [sic] requiring technicians to attend meetings, and of imposing 'charge backs.'"  <u>Arnold</u>, 2011 WL 839636, at *7.

"The FLSA establishes a national standard securing minimum compensation for the lowest-paid workers."  <u>Leavitt v. Northwestern Bell Tel. Co.</u>, 921 F.2d 160, 162 (8th Cir. 1990); <u>see</u> <u>also</u> <u>Landers</u>, 771 F.3d at 640 ("The FLSA sets a national minimum wage[ ] ... and requires overtime pay of one and a half times an employee's hourly wage for every hour worked over 40 hours in a week....") (citing <u>Probert v. Family Centered Servs. of Alaska, Inc.</u>, 651 F.3d 1007, 1009–10 (9th Cir. 2011) (citations omitted); 29 U.S.C. § 206(a)(1) (minimum wage)).  "The language of the FLSA's minimum wage provision establishes the elements that should be alleged in order to survive a motion to dismiss. 29 U.S.C. § 206(a) provides: 'Every employer shall pay to each of his employees who in any workweek is engaged in commerce ... wages at the following rates ... [$5.15 per hour].'  Thus, 'where the plaintiff alleges violations of the FLSA's minimum ... wage provision[ ], the complaint should, at least approximately, allege the hours worked for which these wages were not received.'"  <u>Jones v. Casey's Gen. Stores</u>, 538 F. Supp. 2d 1094, 1102 (S.D. Iowa 2008) (citing <u>Zhong v. August August Corp.</u>, 498 F.Supp.2d 625, 628 (S.D.N.Y. 2007) (a complaint that asserted only

"generic, conclusory assertions of a right to relief under the FLSA minimum wage provision cannot survive a Rule 12(b)(6) motion)).

At this stage, plaintiffs' pleading regarding their minimum wage claims is sufficient. Unlike <u>Bailey</u> and <u>LePage</u> where the courts found plaintiffs' conclusory allegations were inadequate to defeat a motion to dismiss their minimum wage claims, plaintiffs in this case did provide an estimate of the number of hours they worked virtually every week in excess of 40 hours, and did set forth with specificity the practices (imposition of chargebacks, failure to compensate them for business expenses or travel time, the requirement that they purchase their own supplies, and the myriad tasks they performed without compensation) that effectively reduced their compensation below the minimum wage required by law. <u>See</u> SAC, ¶¶ 70-80. They also estimated how these practices specifically reduced their pay. <u>Id.</u>, ¶¶ 90 (Schmidt); 95 (Hanggi); 102 (Benjegerdes); 104 (Kiekbusch); 114 (Nord); 119 (Finwall); 126 (Monroe); 132 (Koziol); 137 (Porisch); 143 (Jerry); 150 (Yang); 156 (Gregerson); 162 (Wemple); 168 (Engelke). Accordingly, just as other courts have found, defendants' challenge to plaintiffs' minimum wage claim fails. <u>See</u>, <u>e.g.</u>, <u>Dowd</u>, 2016 WL 28866, at *6-7 (rejecting DIRECTV's "mathematical calculations" regarding minimum wage claims and stating that these calculations were "based on the flawed legal premise that wages can be averaged over time to determine whether an employee has a claim to a minimum wage."); <u>Amponsah</u> Order, p. 17 (plaintiffs' assertion that they were subjected to "an effective wage below" the minimum wage based on the same allegations cited in the instant SAC, "accepted as true, raise Plaintiffs' claim that they were not paid an effective minimum wage above a speculative level."); <u>Berger</u>, 2015 WL 1799996, at *8 (rejecting

the idea that plaintiffs had to plead their minimum wage violations with "mathematical precision" and finding that a description of the policies that resulted in a reduction of plaintiffs' wages below the minimum standard were sufficient); <u>Collins</u> Order, pp. 8-10 (similar allegations deemed sufficient to state a claim for an FLSA minimum wage violation); <u>Doucette</u> Order, pp. 14-16 (noting that a "simple statement that the employer failed to pay overtime and/or minimum wage" is sufficient to defeat a motion to dismiss, and further noting that relevant records of wages, hours and other employment data are kept by the employers, not employees) (citation omitted); <u>Roslov</u> Order, p. 5 (plaintiffs' allegations that defendants imposed chargebacks that resulted in them receiving less than minimum wage sufficient to defeat motion to dismiss); <u>Mabry</u>, 2015 WL 5554023, at *4-5 (allegations similar to the allegations in the instant complaint sufficient to state a claim for FLSA minimum wage violation).[18]

For the same reasons, the Court rejects defendants' arguments regarding the minimum wage claims of Hanggi, Finwall and Monroe. Defendants calculated their wages based on the allegations in the SAC, and submitted that based on those calculations, these plaintiffs' wages did not fall below the federal minimum wage of $7.25 per hour. Defs.' Mem., pp. 23-25. Plaintiffs responded that it was not dispositive

---

[18]    Other courts have dismissed comparable minimum wage claims by satellite technicians. <u>See</u> <u>McCaffery</u> Order, pp. 7-13 (dismissing minimum wage claims based on calculations derived from the allegations in the complaint, but noting that plaintiffs could seek leave to reinstate these claims if discovery showed they were paid less than minimum wage in at least one week); <u>Field</u> Order, p. 5 (dismissing minimum wage claims because plaintiffs failed to identify the work weeks in which they were paid less than minimum wage); <u>Chesley</u>, 2015 WL 3549129, at *5 (dismissing minimum wage claims because plaintiffs failed to allege how much they were paid per task and how long each task took, making it impossible to "discern whether the effective wage rate in a given week was below the statutory minimum.") (citation omitted). This Court did not find their reasoning or conclusions persuasive.

to their minimum wage claims that in a given workweek one of these plaintiffs may have been paid above the minimum wage, because in another workweek, he would be paid far less than the minimum wage based on the imposition of chargebacks, non-compensable tasks and the imposition of business expenses.  Pls.' Mem., p. 20 (citing Alverez v. IBP, Inc., 339 F.3d 894, 912 (9th Cir. 2003), aff'd, 546 U.S. 21 (2005) (noting that some courts have found that under the FLSA, the right to recover minimum wage accrues each workweek, not by individual hour).  The Court agrees.

The Court was persuaded by the reasoning of the courts in Dowd, Berger, Collins, Doucette, Roslov and Mabry, which found similar allegations sufficient to state a minimum wage claim, or rejected defendants' wage calculations altogether.  The Court finds that the estimates by Hangii, Finwall and Monroe, in conjunction with the allegations that the practices imposed on all plaintiffs effectively reduced their compensation below the minimum wage, raised to the level of plausibility that there were weeks in which these plaintiffs were paid less than the minimum wage.[19]

d.   Kiekbusch

Defendants objected to what they claimed was impermissible claim-splitting by Kiekbusch, and as a result, his claims must be dismissed.  Defs.' Mem., pp. 37-39.  According to defendants, Kiekbusch continues to pursue his FLSA claims against DIRECTV as an opt-in plaintiff in the Arnold litigation, and is pursuing the same claims

---

[19]   Although not central to this Court's recommendation regarding the wage claims of Hanggi, Finwall and Monroe, the Court was not satisfied with defendants' efforts to dispose of their claims without the benefit of any supporting documents in defendants' possession that may surface during discovery.  At this stage of the proceedings, there are no payroll or timecard records in evidence and these plaintiffs were only required to meet the plausibility standards of Rule 8, Iqbal and Twombly, which they did.

against both DIRECTV and DirectSat in the instant litigation.  Id., pp. 37-38.  Plaintiffs stated that Kiekbusch opted into Arnold and Lang, but he was dismissed without prejudice in Lange and although his name inadvertently failed to appear on the Arnold voluntary decertification list, he is not named in a subclass and is not pursuing a claim in Arnold.  Pls.' Mem. in Opp., p. 27.  Based on this representation, the Court concludes that there is no basis to dismiss Keikbusch from this suit.

### 3.  FLSA Statute of Limitations and Willfulness

Defendants argued that plaintiffs' FLSA claims had to be dismissed to the extent plaintiffs were seeking to recover beyond the two-year limitation period imposed by the FLSA because the SAC's "generic" statements about willfulness were insufficient to extend the FLSA statute of limitations to three years.  Defs.' Mem., p. 26 (citing SAC, ¶¶ 63, 176-179).  If the Court agreed, then defendants asserted:

> The individual claims of Gregerson and Wemple against DirectSat were completely time-barred as Gregerson's alleged employment ended in October, 2012 (SAC, ¶ 153), Wemple's employment ended in December, 2012, (citing SAC, ¶ 159) and these plaintiffs did not assert FLSA claims against DirectSat until March 12, 2015.

> Other plaintiffs' claims against DirectSat were time-barred in part based on their allegations regarding their employment periods and because the limitations period was not extended by evidence of willfulness.  According to defendants, Engelke is limited to a recovery period of March 12, 2013 to December, 2014; Finwall is limited to a recovery period of November 1, 2011 to March, 2013; Hanggi is limited to recovery period of November 1, 2011 to February, 2012; Kiekbusch is limited to a recovery period of November 1, 2011 to May, 2012; Monroe is limited to a recovery period of November 1, 2011 to February, 2012; Porisch is limited to a recovery period of November 1, 2011 to September, 2013; Schmidt is limited to a recovery period of November 1, 2011 to January, 2012 and Yang is limited to a recovery period of November 1, 2011 to 2012.

Even for those plaintiffs who were entitled to tolling of the limitations period based on their individual claims against DIRECTV in other actions, their claims were barred. Nord filed a consent form in <u>Lang</u> on July 30, 2012, two years after the end of his purported employment. Jerry filed a consent form in <u>Lang</u> on September 19, 2012 – two years after the end of his purported employment period. Only the claims of Koziol, Gregerson, and Wemple against DIRECTV made in other actions were within the two-year limitation period.

The FLSA claims of the remaining plaintiffs against DIRECTV were barred in part. Benjegerdes was limited to a recovery period against DIRECTV of July 25, 2010 to September, 2010; Engelke was limited to a recovery period of December 30, 2013[20] to December, 2014; Finwall was limited to a recovery period of July 30, 2010 to March, 2013; Hanggi was limited to a recovery period of July 25, 2010 to February, 2012; Kiekbusch was limited to a recovery period of July 25, 2010 to 2012; Monroe was limited to a recovery period of August 3, 2010 to February, 2012; Porisch was limited to a recovery period of November 1, 2011 to September, 2013; Yang was limited to a recovery period of December 23, 2011 to 2012. Defendants calculated the expiration of these limitations periods based on the following factors: (1) lack of evidence of willfulness, which would have extended the limitations period; (2) the dates of employment alleged for each plaintiff; and (3) the date on which these plaintiffs filed their consent forms in <u>Lang</u>.

<u>Id.</u>, pp. 27-33 (citations omitted).

Plaintiffs responded that their allegations of willfulness were sufficient to trigger the three-year statute of limitations provided by 29 U.S.C. § 255(a). Pls.' Mem. in Opp., p. 21. Plaintiffs noted that a statute of limitations bar is generally an affirmative defense and that whether an FLSA violation was willful (therefore triggering the three-year limitation period) was a question of fact, not appropriate for determination under Rule

---

[20]     Defendants stated that the period was limited to "December 30, 2011 (495 days after August 22, 2012)." Presumably this is a typographical error.

12(b)(6).  Id. (citing LePage, 2008 WL 2570815, at *3; Acosta Colon v. Wyeth Pharm. Co., 363 F. Supp. 2d 24, 29, 30 (D. P.R. 2005)).  Moreover, plaintiffs alleged that the entire purpose of defendants' employment scheme was to avoid complying with the FLSA and, as a result, plaintiffs adequately alleged willfulness.  Id., p. 22 (citing SAC, ¶¶ 1, 2, 43, 44, 62-64, 81, 176-179).  Plaintiffs also pointed out that the Department of Labor had already taken action against DIRECTV based on the same practices plaintiffs have challenged in the instant lawsuit, which indicated that DIRECTV knew that its conduct violated the FLSA and provided evidence of willfulness.  Id., n.7.

On reply, defendants rejected plaintiffs' contention that their allegations of willfulness were adequate, citing extra-jurisdictional cases in which courts have found that such allegations were insufficient to defeat a motion for summary judgment. Defendants' Reply Memorandum ("Defs.' Reply"), pp. 9-10 [Docket No. 119], (citing Perez v. Davis Design & Dev., Inc., Civ. No. 13-118, 2013 WL 6835095, at *6 (W.D. Pa. Dec. 23, 2013); Rowlett v. Mich. Bell, Civ. No. 11-1269, 2013 WL 308881, at *2 (W.D. Mich. Jan. 25, 2013); Butler v. East Lake Mgmt., Civ. No. 10-6652, 2012 WL 2115518, at * 5 (N.D. Ill. June 11, 2012)).  .

The FLSA generally provides for a two-year statute of limitations.  29 U.S.C. § 255(a).  If a cause of action arises out of a willful violation, then the limitations period is extended to three years.  Id.  Conduct is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." Smith v. Heartland Auto. Servs., Inc., 418 F. Supp. 2d 1129, 1141 (D. Minn. 2006) (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S.Ct. 1677, 100

L.Ed.2d 115 (1988)). Willfulness of the employer's violation of the FLSA is a question of fact. Longlois v. Stratasys, Inc., 88 F. Supp. 3d 1058, 1081 (D. Minn. 2015).

A statute of limitations is an affirmative defense, which it is a defendant's burden to plead and prove. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 753 (2008). Therefore, the possible existence of a statute of limitations defense is not ordinarily a ground for dismissal under Rule 12(b)(6), "unless the complaint itself establishes the defense." Jessie v. Potter, 516 F.3d 709, 715, n.2 (8th Cir. 2008) (citing Varner v. Peterson Farms, 371 F.3d 1011, 1017-18 (8th Cir. 2004)); see also, Johnson v. Derhaag Motor Sports, Inc., Civ. No. 13-2311 (SRN/FLN), 2014 WL 5817004, at *21 (D. Minn. Nov. 10, 2014) ("As an initial matter, the Court notes that lack of willfulness under the FLSA is an affirmative defense that Defendants are required to plead in their Answer. See Fed. R. Civ. P. 8(c)(1). The Eighth Circuit explained in Mumbower v. Callicott that "29 U.S.C. § 255(a) was intended to serve as a conventional limitation on the remedy, not upon the right to bring the action, and must be pleaded as an affirmative defense in compliance with Fed. R. Civ. P. 8(c). 526 F.2d 1183, 1187 n. 5 (8th Cir. 1975). Therefore, in order to contest a willfulness allegation, a party that allegedly violated the FLSA must plead that the statute of limitations restricts the plaintiff's remedy.")

The SAC does not establish as a matter of law that the two-year limitations period governs because of the extensive and contrary allegations of the willful nature of defendants' employment scheme. It is true that the SAC alleged in somewhat rote fashion that defendants willfully misrepresented their employer relationship with plaintiffs for the purpose of avoiding the FLSA. SAC, ¶¶ 63, 176, 177. However,

plaintiffs did not rest solely on this claim. Rather, the <u>entire thrust</u> of the SAC is that defendants created an employment scheme for the very purpose of avoiding the application of the FLSA. <u>See</u>, <u>e.g.</u>, SAC, ¶¶ 62-64. Further, plaintiffs supported their claims of willfulness by alleging that the Provider Network was purposefully designed to exercise the right of control over DIRECTV's technician corps while avoiding the responsibility of complying with the requirements of the FLSA" (SAC, ¶ 44); DIRECTV willfully failed to maintain time records and other employment documentation to save payroll and other costs (SAC, ¶ 63); DIRECTV willfully failed to pay minimum wage and overtime compensation to plaintiffs to avoid state and federal employment laws (<u>id.</u>); defendants willfully failed to keep accurate records of plaintiffs' hours, compensation, and expenses (SAC, ¶ 178); defendants' fissured employment schemes have been challenged in court numerous times around the country against DIRECTV, DirectSat and other HSP members of DIRECTV's Provider Network (SAC, ¶ 179); and DIRECTV is currently a defendant in a lawsuit brought by the U.S. Department of Labor challenging virtually the same systems challenged in the instant suit. <u>Id.</u> These allegations are sufficient at this stage to support allegations of willful and reckless conduct. <u>See</u>, <u>e.g.</u> <u>Amponsah</u> Order, p. 10 (allegations regarding DIRECTV and its providers' employment scheme sufficient to "raise the issue of willfulness above mere speculation"); <u>Alston</u>, 2015 WL 2451219, at *4 (same); <u>Collins</u> Order, pp. 12-13 (same); <u>Cooper et. al. v. DIRECTV</u>, Civ. No. 14-8097, D. CD Cal. Order dated May 21, 2015 (found at Docket No. 130-10 in the instant case), (same); <u>Doucette</u>, 2015 WL 2373271, at * 5 (same); <u>Mabry</u>, 2015 WL 5554023, at *5 (same).

For all of the foregoing reasons, the Court recommends denying defendants' motions to dismiss as to Count I.[21]

## B.  Count II: Willful Misrepresentation of Employment Relationship Under Minn. Stat. § 181.722

Defendants sought dismissal of Count II on the following grounds.  First, Minn. Stat. § 181.722 applies only to the construction industry and plaintiffs, who provide satellite television services, are not included within the definition of "construction worker" found in Minn. Stat. § 179.254 and incorporated by Minn. Stat. § 181.722, subd. 4. Defs.' Mem., pp. 34-35.  Second, the SAC did not allege that that any defendant misrepresented the nature of a purported employment relationship to any "federal, state, or local government unit; to other employers; or to its employees" as required by Minn. Stat. § 181.722, subd. 1. Id., p. 35.  Third, the statute does not apply because there is no direct employment relationship between plaintiffs and either defendant.  Id.  Thus, even if plaintiffs could be construed to be a "construction worker[s] . . . who is not an independent contractor" under the statute, which defendants did not concede, it would be the subcontracting entities with whom plaintiffs had a direct relationship that would be the "violators" against whom a civil action for damages could be taken, not defendants. Id.

In addition to the foregoing grounds, defendants contended that plaintiffs' claims under Minn. Stat. § 181.722 were barred by Minn. Stat. § 541.07, which described a two-year limitation period for the recovery of wages, overtime, damages, fees or

---

[21]    Defendants also moved for dismissal on the ground that there is no private right of action under the FLSA for inaccurate recordkeeping, and therefore, to the extent the SAC was alleging such a violation, it had to be dismissed.  Defs.' Mem., p. 33.  Plaintiffs agreed and stated they had not asserted such a claim.  Pls.' Mem. in Opp., p. 7, n.2.

penalties accruing under state or federal law. Id., p. 36. Defendants noted that Minn. Stat. § 541.07(5) provides a three-year limitations period where nonpayment is willful, but submitted that the SAC "woefully fail[ed] to plead willfulness" and, as a result, the three-year period did not apply. Id., p. 36. Plaintiffs did not assert their Minnesota statutory claim until the instant suit was filed in California on November 1, 2011; thus, no claim can be asserted against the defendants by Schmidt, Hanggi, Kiekbusch, Finwall, Koziol, Porisch and Yang who all alleged employment dates before that date, or in the case of Yang, before December 23, 2011, when he joined the suit. Id.

Lastly, defendants maintained that Porisch alleged that he worked in Wisconsin, (SAC ¶ 135), and the Minnesota statute does not apply in Wisconsin. Id., p. 37. Therefore, any claim under the Minnesota statute arising out of time Porisch worked in Wisconsin must be dismissed. Id.

Plaintiffs submitted that as satellite system installers, they should be treated as "construction workers" for the following reasons. First, the list of trades reflected in Minn. Stat. § 179.254(3) is non-exhaustive and should not be read to exclude plaintiffs. Pls.' Mem., p. 26. Moreover, plaintiffs are "laborers" and consequently, are covered by the plain language of Minn. Stat. § 179.254, subd. 3. Id.

Second, a different Minnesota statute governing construction codes and licensing describes licensure requirements for "satellite system installers." Id. (citing Minn. Stat. § 326B.33). Plaintiffs asserted that "as satellite system installers, [they] are considered part of the construction industry elsewhere in Minnesota's statutory scheme, and properly asserted claims for damages under § 181.722." Id.

Third, plaintiffs contended that all of their claims were based on work performed in <u>Minnesota</u>, and therefore, defendants were not entitled to dismissal based on work performed out of state.  <u>Id.</u>  For these reasons, plaintiffs contended that the Court should deny defendants' motion to dismiss their state law claims.

On reply, defendants rejected plaintiffs' attempt to leverage the inclusion of satellite system installers in another, unrelated provision of the Minnesota statutes, arguing that inclusion of satellite system installers in Minn. Stat. § 326B.33 only confirmed the legislature's awareness of and intentional exclusion of "satellite system installers" from the definition of "construction worker" in Minn. Stat. § 181.722.  Defs.' Reply, p. 12.

As a preliminary matter, the Court notes that neither the parties nor the Court could locate any case interpreting either Minn. Stat. § 181.722 or Minn. Stat. § 179.254, subd. 3.  Further, neither party submitted any legislative history of the statutes to aid the Court and the Court could not locate any relevant, reported legislative history in its review of the statutes.

The goal of statutory interpretation is to "ascertain and effectuate the intention of the legislature."  Minn. Stat. § 645.16; <u>accord</u>, <u>Brua v. Minnesota Joint Underwriting Ass'n</u>, 778 N.W.2d 294, 300 (Minn. 2010); <u>Educ. Minn.-Chisholm v. Indep. Sch. Dist. No. 695</u>, 662 N.W.2d 139, 143 (Minn. 2003).  A statute is ambiguous only if the language is subject to more than one reasonable interpretation.  <u>American Family Ins. Grp. V. Schroedi</u>, 616 N.W.2d 273, 277 (Minn. 2000).  If the meaning of a statute is unambiguous, the court must interpret the statute's text according to its plain language. <u>Molloy v. Meier</u>, 679 N.W.2d 711, 723 (Minn. 2004).

48

On the other hand, if a statute is ambiguous, the court applies other canons of construction to discern the legislature's intent.  See Minn. Stat. § 645.16.  For example, "[w]hile statutory construction focuses on the language of the provision at hand, it is sometimes necessary to analyze that provision in the context of surrounding sections." See American Family Ins, 616 N.W.2d at 278 (citation omitted).  Other times, it may be appropriate to examine the statutory titles to discover the legislature's intentions.  See Essling v. Markman, 335 N.W.2d 237, 239, n.2 (Minn. 1983) ("Statutory titles are required by the Minnesota Constitution. Minn. Const. art. IV, § 17. The purpose of the title is to inform the members of the legislature of the Act's content.  Western States Utilities Co. v. City of Waseca, 242 Minn. 302, 315, 65 N.W.2d 255, 265 (1954). Although the title was never intended as an index to the law, it may be considered for the purpose of ascertaining the legislature's intent.  State v. Northwestern States Portland Cement Co., 258 Minn. 162, 166, 103 N.W.2d 225, 227–28 (1960)").  And on still other occasions, courts may resort to dictionaries to determine the plain and ordinary meaning of words and phrases in a statute.  Larson v. Northwestern Mut. Life Ins. Co., 855 N.W.2d 293, 301 (Minn. 2014) (citing State v. Heiges, 806 N.W.2d 1, 15 (Minn. 2011)).

In 2005, the Minnesota Legislature enacted Minn. Stat. § 181.722, which forbids misrepresentation by an employer of the employment relationship.  20 Minn. Prac., Business Law Deskbook § 11:2.  "The law prohibits an employer from misrepresenting the nature of the relationship to any government unit or to its employees and (2) from requesting or requiring an employee to enter into an agreement that results in misclassification."  Id.  Additionally, the statute directs that the nature of the employment

relationship should be determined by the tests used under applicable workers compensation and unemployment insurance laws. Id. "The statute provides no explicit cause of action, except that a construction worker injured by a violation of the law may seek damages from the violator." Id.

The statute that immediately proceeds Minn. Stat. § 181.722 is Minn. Stat. § 181.721. It is entitled "Construction Bid Equity," and requires a successful bidder on a project to provide workers compensation and unemployment benefits, and "applies to any nonresidential project for the construction, repair, remodeling, alteration, conversion, modernization, improvement, rehabilitation, replacement, or renovation of a building or structure." Minn. Stat. § 181.721. The statute that immediately follows Minn. Stat. § 181.722 is Minn. Stat. § 181.723. It is entitled "Construction Contractors," and states that it applies to:

> individuals performing public or private sector commercial or residential building construction or improvement services. Building construction and improvement services do not include (1) the manufacture, supply, or sale of products, materials, or merchandise; (2) landscaping services for the maintenance or removal of existing plants, shrubs, trees, and other vegetation, whether or not the services are provided as part of a contract for the building construction or improvement services; and (3) all other landscaping services, unless the other landscaping services are provided as part of a contract for the building construction or improvement services.

Minn. Stat. § 181.723, subd. 2.

This Court finds that Minn. Stat. § 179.254, subd. 3 does not include satellite system installers. It is true that the statute presents a non-exhaustive list of representative occupations, but that list is preceded by the phrase "any laborer or member of a trade who is employed in the building or construction industry . . . ." Minn.

Stat. § 179.254, subd. 3 (emphasis added).  There is no evidence that satellite system installers (or "installation technicians" as they are described in the SAC) are employed in the building or construction industry.   Considering the context of Minn. Stat. § 181.723 and surrounding statutes, the Court concludes it was intended to apply to construction workers, as that term is commonly known.  Webster's Dictionary defines "construction" as the "act or process of building something" and "the business of building things (such as houses or roads)."  http://www.merriam-webster.com/dictionary/construction.    By limiting the application of "Minn. Stat. § 179.254, subd. 3 to "any laborer or member of a trade who is employed in the building or construction industry," the Court finds that the legislature intended to rely on this conventional definition of "construction worker" – i.e., a person engaged in building things.   Satellite system installation technicians are not captured by the phrase "construction worker."

Additionally, the term "construction laborers" is not a catchall phrase broad enough to encompass installation technicians, as plaintiffs argue.  But even if the term was a general catchall phrase, the term "laborers" in this context refers to construction laborers, not anyone who "labors" at an occupation.

As for plaintiffs' reliance on Minn. Stat. § 326B.33, the Court does not find their argument persuasive.  Minn. Stat. § 326B.33 is a construction code and licensing statute and does not define "construction worker" or "laborer."   See 326B.01 (definitions).   Minn. Stat. § 326B.33 governs electricians and an array of other professions involved in electrical work, including not only satellite system installers, but also elevator constructors, linemen, and maintenance electricians.  Merely because the

licensing requirements for satellite system installers fall within this chapter does not mean that installers are "construction workers" for the purposes of an entirely different statute (Minn. Stat. § 181.722).  Nor is there any indication in the SAC that the plaintiffs were licensed pursuant to Minn. Stat. § 326B.33 or required to be licensed under the statute.

The Court cannot read Minn. Stat. §§ 181.722 and  179.254 more broadly than they are written, nor can the Court import words into the statutes that are not there. Plaintiffs are satellite television installation technicians.   They install and repair DIRECTV satellite television systems.  They are not governed by Minn. Stat. § 181.722.

For all of these reasons, the Court recommends that plaintiffs' state law claims be dismissed with prejudice as they do not state a claim as a matter of law.

### C.    Conditional Motion For Time Within Which to Seek Leave to Amend

Having determined that plaintiffs' FLSA claims were adequate, the Court recommends denying this motion as moot.  Leave to amend the SAC is not required because the only deficiency this Court has identified is Count II, which the Court found failed as a matter of law.

## VII.    RECOMMENDATION

For the reasons set forth above, it is recommended that:

1.    Defendant DIRECTV, LLC's Motion to Dismiss Plaintiffs' Second Amended Complaint [Docket No. 101] and DirectSat USA, LLC's Motion to Dismiss Plaintiffs' Second Amended Complaint [Docket No. 102] be **GRANTED** in part and **DENIED** in part as follows:

(a).    Defendants' motion as to Count I (plaintiffs' claims under the Fair Labor Standards Act) should be denied and these claims should be allowed to proceed.

52

(b).    Defendants' motion as to Count II (plaintiffs' claims arising under Minn. Stat. § 181.722) should be granted and these claims should be dismissed with prejudice.

2.    Plaintiffs' Conditional Motion for Time Within Which to Seek Leave to Amend Should Court Grant Defendants' Motions to Dismiss Plaintiffs' Second Amended Complaint [Docket No. 112] be **DENIED as moot.**

Dated: January 22, 2016                          *Janie S. Mayeron*
                                                 JANIE S. MAYERON
                                                 United States Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 6, 2016,** a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within 14 days after service thereof. All briefs filed under this Rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.