UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| GEORGE SCHMIDT, JR., TIMOTHY HANGGI, DAN BENJEGERDES, ROBERT KIEKBUSCH, JR., JAMES NORD, MITCHELL FINWALL, DYLAN MONROE, JOHN KOZIOL, TANNER PORISCH, NEILL JERRY, JEFFERY ENGELKE, DENNIS GREGORSON, CRAIG WEMPLE, VACHEE YANG, <br><br> Plaintiffs, <br><br> v. <br><br> DIRECTV, LLC, and DIRECTSAT USA, LLC, <br><br> Defendants. | Civil No. 14-3000 (JRT/TNL) <br><br> **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND SANCTIONS** |

> George A. Hanson, **STUEVE SIEGEL HANSON, LLP**, 460 Nichols Road, Suite 200, Kansas City, MO 64112, and Paul J. Lukas, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiffs.
>
> Colin D. Dougherty, **FOX ROTHSCHILD LLP**, 10 Sentry Parkway, Suite 200, Blue Bell, PA 19422, and Aaron Mills Scott, **FOX ROTHSCHILD LLP**, 222 South Ninth Street, Suite 2000, Minneapolis, MN 55402, for defendants.

Defendants DIRECTV, LLC ("DIRECTV") and DirectSat USA, LLC ("DirectSat") (together "Defendants") sell satellite subscription services to the general public. DIRECTV contracts with DirectSat to perform installations, and DirectSat, in turn, subcontracts with entities ("Subordinate Entities")[1] to perform that work. Plaintiffs

---
[1] Plaintiffs did not name the Subordinate Entities defendants in this case.

George Schmidt, Jr., Timothy Hanggi, Dan Benjegerdes, Robert Kiekbusch, Jr., James Nord, Mitchell Finwall, Dylan Monroe, John Koziol, Tanner Porisch, Neill Jerry, Jeffery Engelke, Dennis Gregorson, Craig Wemple, and Vachee Yang (collectively, "Plaintiffs") were Minnesota satellite installation technicians who installed DIRECTV satellite systems for customers.

Plaintiffs instituted this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, seeking to obtain overtime compensation from Defendants for uncompensated work performed in excess of forty hours per week. Plaintiffs assert that Defendants retained control and management over Plaintiffs but attempted to avoid FLSA overtime requirements by treating Plaintiffs solely as independent contractors or employees of Subordinate Entities.

Defendants move for summary judgment on several grounds and also move for sanctions relating to a declaration report filed by Plaintiffs' counsel. The Court will grant in part and deny in part Defendants' motions for summary judgment. Specifically, the Court will grant summary judgment with respect to Plaintiffs' FLSA claims falling outside of a two-year limitations period because the record does not support a finding of Defendants' willfulness. In all other respects, the Court will deny summary judgment because there are genuine and material factual disputes relating to the FLSA claims and defenses. The Court will also deny the Defendants' motion for sanctions because the report at issue need not comply with Fed. R. Evid. 1006 at this stage of the proceedings.

# BACKGROUND[2]

## I. FACTUAL BACKGROUND

DIRECTV, a California limited liability company, (Second Decl. of Colin D. Dougherty ("Second Dougherty Decl."), Ex. 126 at 1, Feb. 1, 2017, Docket No. 187), is a "leading provider of digital television entertainment," that sells "digital entertainment programming" to consumers via satellite, (First Decl. of Colin D. Dougherty ("First Dougherty Decl."), Ex. 79 at 5, Feb. 1, 2017, Docket No. 186). After a customer agrees to purchase a DIRECTV satellite system, technicians receive a work order to install the necessary DIRECTV equipment in the customer's home or business. (*Id.* at 6; Second Dougherty Decl., Ex. 148 at 65:22-66:4, 69:13-23.)

DIRECTV contracts with home service providers ("HSPs"), like DirectSat, to perform work orders for installations. (Second Dougherty Decl., Ex. 148 at 16:25-17:22; 45:20-46:4.) DirectSat is a Delaware limited liability company with its principal place of business in Pennsylvania. (First Dougherty Decl., Ex. 3 ¶ 21; *id.*, Ex. 5 ¶ 21.) DirectSat does not share a board of directors, officers, or offices with DIRECTV. (Second Dougherty Decl., Ex. 156 ¶ 6.)

DirectSat, in turn, contracts with Subordinate Entities to perform the installation work that DirectSat agreed to provide DIRECTV. (Second Dougherty Decl., Ex. 151 at 25:17-26:7.) It is undisputed that Plaintiffs were Minnesota satellite installation technicians who installed DIRECTV satellite systems for customers while Plaintiffs were classified as either W-2 employees or independent contractors of Subordinate Entities.

---

[2] The Court uses internal pagination to cite records filed under seal and CM/ECF pagination to cite records not filed under seal.

The relationships between DIRECTV and DirectSat, as well as DirectSat and Subordinate Entities, are delineated in the contractual agreements detailed in part below.

**A.     DIRECTV and DirectSat:  Home Services Provider Agreement ("HSP Agreement")**

The relationship between DIRECTV and DirectSat is governed by an HSP Agreement.  (*See* Second Dougherty Decl., Ex. 126 ("HSP Agreement").)[3]  The HSP Agreement states that DirectSat is as an "independent contractor" (*id.* at 11), and explains that DirectSat will install and maintain DIRECTV's satellite system based on DIRECTV's work orders, (*id.* at 1).  To compensate DirectSat for its services under the agreement, DIRECTV pays DirectSat according to a rate matrix for certain services and according to a schedule for certain service calls.  (*Id.* at 5-6.)

In pertinent part, the HSP Agreement places certain restrictions on DirectSat when it dispatches a subcontractor technician to perform the installation and maintenance services contemplated in the HSP Agreement.  (*See id.* at 4 (incorporating Exhibit 2.c).)  First, it requires any DirectSat subcontractor technician to be "qualified, able and suitable to perform the duties assigned in a good, professional and workmanlike manner and with care and concern for DIRECTV" and have "successfully completed the applicable DIRECTV-approved training program."  (*Id.* at 25.)  Additionally, the HSP Agreement requires that any DirectSat subcontractor technician pass a background check and drug

---

[3] The parties do not dispute that Exhibit 126 serves as an adequate example for the HSP Agreement between DIRECTV and DirectSat for purposes of Defendants' summary judgment motion.  (*See* Defs.' Mem. in Supp. of Mots. for Summ. J., ("Defs.' Mem.") Statement of Facts ("DSOF") ¶ 21 & n.3, Feb 1, 2017, Docket No. 188; Pls.' Mem. in Opp'n to Defs.' Mots. for Summ. J. ("Pls.' Mem.") at 61, Mar. 3, 2017, Docket No. 224 ("Plaintiffs do not dispute the facts in . . . [DSOF ¶] 21)).

test, (*id.*), wear a DIRECTV uniform (*id.* at 27), adhere to DIRECTV personal grooming standards, (*id.*), and obtain specific technician certifications, (*id.*). DIRECTV also has the sole ability to approve or terminate any subcontractor technician. (*Id.* at 25.)

### B. DirectSat and Subordinate Entities: Independent Contractor Agreement ("ICA")

Similarly, the relationship between DirectSat and Subordinate Entities is governed by an ICA. (*See* Second Dougherty Decl., Ex. 135 ("ICA").)[4] The ICA provides that the respective Subordinate Entity is an "independent contractor" or "Contractor," that will perform satellite installation services in accordance with DIRECTV's quality assurance guidelines. (*Id.* at 2.) Under the ICA, DirectSat pays the Subordinate Entity a predetermined amount per task, and the amount paid varies based on the type of task. (*Id.* at 1, 11-12.)

In pertinent part, the ICA requires a Subordinate Entity to conduct drug tests and background checks of its technicians in accordance with DIRECTV's guidelines, and to provide those results to DirectSat. (*Id.* at 2.) The ICA also requires that a Subordinate Entity provide written notification to DirectSat of technicians who resign or are terminated shortly after a personnel change, (*id.* at 2); submit to DirectSat a motor vehicle record review of technicians before they begin working, (*id.* at 3); and clear each technician with DirectSat's risk management department, (*id.* at 2-3).

---

[4] The parties do not dispute that DirectSat entered into an ICA with each of the Subordinate Entities and that Exhibit 135 serves as an illustrative ICA for purposes of Defendants' summary judgment motion. (*See* Defs.' Mem., DSOF ¶¶ 44-45 & n.4; Pls.' Mem. at 61, 80 (not disputing DSOF ¶ 44 and only disputing DSOF ¶ 45 to the extent DSOF ¶ 45 alleges that the ICA refers to a Subordinate Company as a "Subcontractor.").

### C. SIEBEL

Defendants also maintain a software called SIEBEL to schedule installation and service call work orders for technicians, regardless of whether that technician is affiliated with DIRECTV, DirectSat, or a Subcontracting Entity. (Decl. of Todd C. Werts ("Werts Decl."), Ex. 19 at 34:5-11, Mar. 3, 2017, Docket No. 198); *see also id.* at 37:15-38:19 (explaining that both DirectSat and DIRECTV use SIEBEL to manage work orders); HSP Agreement at 26 (providing SIEBEL maintains subcontractor technicians' identities). While either Defendant can access SIEBEL, the Subordinate Entities cannot. (Werts Decl., Ex. 19 at 34:16-25; *id.*, Ex. 21 at 43:1-7; *id.*, Ex. 29 at 36:7-37:20.) SIEBEL maintains contact information, work-day starting addresses, skill sets, professional certifications, and work order history for all technicians. (Werts Decl., Ex. 30 at 121:16-122:5, 124:25-125:9, 141:12-143:12, 270:23-271:8; Second Doughtery Decl., Ex. 148 at 216:5-217:29.)

There is conflicting evidence on whether SIEBEL accurately recorded or had the ability to accurately record the hours Plaintiffs worked. (*Compare* Werts Decl., Ex. 29 at 151:16-24 (suggesting SIEIBEL could track the actual start and stop times, travel times, and planned duration times for work orders), *with* Doughtery Decl., Ex. 150 at 275:7-12 (providing SIEBEL does not accurately reflect the hours Plaintiffs worked), *and id.*, Ex. 151 at 67:17-68:15 (explaining SIEBEL only "soft books" work orders to technicians "because [DirectSat or a Subcontracting Entity] could end up [scheduling] any different technician.").)

## II. PROCEDURAL BACKGROUND

Plaintiffs filed the initial Complaint against Defendants on November 1, 2013, and the Second Amended Complaint on March 12, 2015. Plaintiffs asserted two claims: (1) violation of the FLSA for uncompensated work performed in excess of forty hours a week; and (2) state-law claims for damages.

On April 3, 2015, Defendants moved to dismiss the action in its entirety. On February 9, 2016, the Court granted Defendants' motion to dismiss the state-law claim, but denied the motion to dismiss the FLSA claim. *Schmidt v. DIRECTV, LLC*, No. 14-3000, 2016 WL 519654 (D. Minn. Jan. 22, 2016), *adopted by* 2016 WL 526210 (D. Minn. Feb. 9, 2016). On February 1, 2017, Defendants moved for summary judgment on the FLSA claim.[5]

## DISCUSSION

### I. SUMMARY JUDGMENT

#### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the action, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

---

[5] On August 2, 2017, the Court received Plaintiff's Notice of Supplemental Authority attaching *Alston v. DIRECTV, Inc.*, No. 14-4093, 2017 WL 2311588 (D.S.C. May 26, 2017) and *Andersen v. DIRECTV, Inc.*, No. 14-2307, 2017 WL 3382158 (D. Ariz. July 26, 2017). (Pls.' Notice of Supp. Authority, Aug. 2, 2017, Docket No. 310.) Defendants filed a response. (Defs.' Resp. to Pls.' Notice of Supp. Authority, Aug. 9, 2017, Docket No. 312.) In deciding the motion for summary judgment, the Court considered the supplemental authority.

return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

### B. JOINT EMPLOYMENT

The FSLA mandates that to maintain a claim for overtime compensation an employer-employee relationship must exist. *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 961-62 (8th Cir. 2015). Defendants first argue Plaintiffs failed to satisfy this threshold requirement because they are not joint employers of Plaintiffs. For Defendants' argument to succeed, the Court must determine that the only reasonable conclusion to be drawn from the undisputed evidence is that Defendants are not Plaintiffs' joint employers.

Under the FLSA, an "[e]mployer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

The Eighth Circuit has not specifically adopted a rigid test to evaluate whether an employer-employee relationship exists under the FLSA, but instead considers all facts that bear on "the economic reality of the arrangement." *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005).

When examining the "economic reality of a relationship," courts generally examine four factors to determine whether an entity is a joint employer under the FLSA: (1) who had "the power to hire and fire the employee"; (2) who "supervised or controlled the employee's work schedule or conditions of employment"; (3) who "determined the rate or method of payment"; and (4) who "maintained [the employee's] employment records." *Schmidt*, 2016 WL 519654, at *9 (collecting cases).[6] Here, the Court finds that Plaintiffs have provided sufficient evidence to preclude summary judgment.

Beginning with the first factor, there is evidence that Defendants played a role in hiring and firing Plaintiffs by specifying eligibility and certification requirements in the HSP Agreement and ICA. By virtue of those contracts, Defendants authorized Subordinate Entities to hire Plaintiffs only if they completed specific training, (HSP Agreement at 25), passed criminal background checks and drug screens, (*id.* at 25; ICA at 2), were cleared by DirectSat's risk management department, (ICA at 2), and submitted to DirectSat's motor vehicle record review (*id.* at 3). In addition, DIRECTV could approve or terminate any Plaintiff within its sole discretion. (HSP Agreement at 25-26.)

---

[6] Additionally, some courts also apply a six-factor test to determine if an individual is an employee under the FLSA. *See Schmidt*, 2016 WL 519654 at *11 n.12 (describing six factors and collecting cases). Because, as described herein, there is sufficient evidence to preclude summary judgment under the four-factor test, the Court declines to address the additional factors.

As to the second factor, there is evidence that Defendants played a role in supervising and controlling Plaintiffs. Defendants required all satellite installations comply with DIRECTV's "Standard Professional Installation Guidelines" ("Guidelines"), (Werts Decl., Ex. 3 at 155:12-157:4; *id.*, Ex. 21 at 47:10-48:3), which in turn required Plaintiffs to wear DIRECTV branded shirts, hats, and carry identification as a DIRECTV representative, (Werts Decl., Ex. 31[7] at 3697). The Guidelines also provided instructions on how Plaintiffs should conduct a preliminary evaluation of the work, (*id.* at 3698), what Plaintiffs should do when approaching the worksite, (*id.*), and a script of what Plaintiffs should say when talking to a customer (*id.* at 3699).[8] Additionally, Plaintiffs submitted evidence DIRECTV training was required when they began working, (HSP Agreement at 25-26; Werts Decl., Ex. 10 at 158:2-23), and that DIRECTV required a monthly training session "to address areas needing immediate improvement, new products and services, or other pertinent information," (Werts Decl., Ex. 13 at 98:24-99:10). Finally, there is evidence that Defendants maintained Plaintiffs' employment record through SIEBEL, including Plaintiffs' contact information, addresses, skill sets, professional certifications, and work order history. (Werts Decl., Ex. 30 at 121:16-122:5, 124:25-125:9, 141:12-143:12, 270:23-271:8; Second Doughtery Decl., Ex. 148 at 216:5-217:29.)

Viewing this evidence in the light most favorable to Plaintiffs, the Court finds there are sufficient issues of material fact regarding the economic relationship between the parties that preclude Defendants' summary judgment motion on this ground.

---

[7] When citing to Exhibit 31, the Court will use internal pagination and drop the first three zeros preceding the page number. For example, "0003697" will be cited as "3697."

[8] The HSP Agreement also required all subcontractor technicians to wear DIRECTV uniforms and adhere to DIRECTV grooming standards. (HSP Agreement at 27.)

## C. FLSA DEFENSES

Defendants next argue that even if the Court finds a genuine issue of material fact regarding joint employment, the FLSA claims nonetheless fail because: (1) Plaintiffs cannot show that Defendants had knowledge of Plaintiffs' alleged unpaid working time; (2) Plaintiffs cannot prove damages; and (3) for several Plaintiffs, in order to recover all or part of their claims against Defendants under the statute of limitations, they must show that Defendants "willfully" violated the law, which they failed to do. The Court will address each issue in turn.

### 1. Knowledge of Unpaid Working Time

The parties first dispute whether Defendants should have known about Plaintiffs' unpaid overtime work based on DIRECTV's SIEBEL system. "[I]n order to prevail on [FLSA] overtime claims, Plaintiffs [are] required to present evidence that they worked above their scheduled hours without compensation and that [Defendants] knew or should have known that they were working overtime." *Hertz v. Woodbury Cty.*, 566 F.3d 775, 781 (8th Cir. 2009). If Defendants "through reasonable diligence, should have acquired knowledge that Plaintiffs were working in excess of their scheduled hours," then such "constructive knowledge" satisfies this element for a FLSA claim. *Id.*

Defendants assert that the instant action is like *Hertz*, where the Eighth Circuit held that "[a]ccess to records indicating that employees were working overtime . . . is not necessarily sufficient to establish constructive knowledge." *Id.* at 781-82. In *Hertz*, police officers brought FLSA claims against Woodbury County for alleged unpaid overtime work. *Id.* at 777. A jury found in favor of Woodbury County, and the police

officers appealed arguing that the district court erred in instructing the jury that the County had no legal duty to consult its Computer Aided Dispatch ("CAD") logs, because that prevented the police officers from establishing Woodbury County should have known they were working overtime. *Id.* at 779, 781. The Eighth Circuit affirmed the district court and held that the CAD logs, which "essentially amount[ed] to a daily report of officer activity and only are referenced to gain an overview of what types of emergencies occurred during a particular period, **as opposed to the schedules of particular officers**," were not sufficient to establish constructive knowledge. *Id.* at 782 (emphasis added).

However, unlike *Hertz*, Plaintiffs submitted evidence that Defendants kept records of Plaintiffs' work schedule and tracked Plaintiffs' job status. (*See* Werts Decl., Ex. 5 at 58:17-60:2 (stating DIRECTV issued a work order with an assigned duration and maintained an "Overbooking File" which tracked the duration of the technician's scheduled work in a given day); Ex. 13 at 91:3-15 (suggesting Defendants scheduled Plaintiffs for five or six day work weeks), 120:8-121:15 (providing SIEBEL reflects when technicians arrived on site to fulfill a work order); *id.*, Ex. 31 at 3689 (stating Defendants required Plaintiffs to report arrival and completion time for a work order).)

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that there is sufficient evidence to raise a genuine issue of fact regarding whether Defendants should have known Plaintiffs' worked overtime based on information available through

SIEBEL.[9] Thus, the Court will deny Defendants' summary judgment motion on this ground.

### 2. Damages

Defendants next argue Plaintiffs have no evidence or computation of damages, which is a requisite element of their FLSA claims, and that summary judgment is therefore appropriate.

Under the FLSA, "[a]n employee who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'" *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)). However, "[i]f an employer has failed to keep records, employees are not denied recovery under the FLSA simply because they cannot prove the precise extent of their uncompensated work." *Id.* Under this relaxed standard of proof, the burden shifts to the employer if an employee offers "sufficient evidence to show the amount and extent of [uncompensated] work as a matter of just and reasonable inference." *Id.* (quoting *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013)).

The parties dispute whether Plaintiffs met this relaxed standard of proof. Plaintiffs mainly rely on SIEBEL's scheduling data to meet their burden. (*See* Werts Decl., Ex. 43 ("Cook Decl.") ¶ 5 (providing that according to SIEBEL, Plaintiffs were scheduled to work 48 to 72 hours per week).) There is conflicting evidence on whether SIEBEL

---

[9] Additionally, the Eighth Circuit in *Hertz* justified its holding that the CAD records were not sufficient to establish Woodbury County's constructive knowledge because "the County has an established procedure for overtime claims that Plaintiffs regularly used." 566 F.3d at 782. That is not the case here, as Defendants did not have a separate overtime system for Plaintiffs.

accurately recorded or had the ability to accurately record the hours Plaintiffs worked. (*Compare id.*, Ex. 29 at 151:16-24 (suggesting SIEIBEL could track the actual start and stop times, travel times, and planned duration times for work orders), *and id.*, Ex. 2 at 76:11-77:12 (providing Defendants can "pin" a job to a particular technician), *with* Second Doughtery Decl., Ex. 150 at 275:7-276:12 (providing SIEBEL does not accurately reflect the hours Plaintiffs worked), *and id.*, Ex. 151 at 67:17-68:15 (explaining SIEBEL only "soft books" work orders to technicians "because [DirectSat or a Subcontracting Entity] could end up [scheduling] any different technician.").)

Thus, because there is a genuine issue of material fact of whether SIEBEL accurately reflects the amount and extent of Plaintiffs' overtime work, the Court will deny Defendants' summary judgment motion on this ground.

### 3. Statute of Limitations

Defendants also argue they are entitled to summary judgment with respect to all Plaintiffs' FLSA claims falling outside of a two-year limitations period because the record does not support a finding of willfulness.

Generally, a FLSA claim must be brought "within two years," however "a [claim] arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). A FLSA violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). This standard requires more than mere negligence. *Id.* at 135. "The burden of establishing willfulness rests on employees." *Fenton v. Farmers Ins. Exch.*, 663 F. Supp. 2d 718, 728 (D. Minn. 2009).

Plaintiffs contend that "willfulness is quintessentially a fact question reserved for a jury." (Pls.' Mem. in Opp'n to Defs.' Mots. for Summ. J. at 218, Mar. 3, 2017, Docket No. 224 (emphasis omitted).) Although willfulness may be submitted to a jury, a plaintiff must first adduce sufficient facts to support such a finding. *See Fenton*, 663 F. Supp. 2d at 728; *see also Bankston v. Illinois*, 60 F.3d 1249, 1253 (7th Cir. 1995) ("It is the jury's province to decide which limitations period, two or three years, applies **in light of the plaintiffs' evidence that the defendants acted willfully**." (emphasis added))).

Here, Plaintiffs have not provided any evidence that Defendants knew or recklessly disregarded the FLSA overtime requirements or that the contractual relationships at issue were designed specifically to avoid FLSA obligations.[10] Instead, Plaintiffs rely upon the existence of other similar FLSA overtime actions brought against Defendants as evidence of Defendants' willfulness in this case. The Court finds that evidence of other lawsuits in this case is insufficient to establish willfulness. *See, e.g.*, *Fugate v. Dolgencorp, LLC*, No. 10-344, 2012 WL 5268494, at *7 (N.D. Ind. Oct. 23, 2012) ("The mere filing of lawsuits cannot be deemed sufficient to put [the employer] on notice that its policy is violative of the FLSA.").

Accordingly, the Court will grant summary judgment in Defendants' favor on the issue of willfulness, and a two-year statute of limitations will apply to every FLSA claim in this action.

---

[10] Plaintiffs' reliance upon *Chao v. A-One Medical Services, Inc.*, 346 F.3d 908 (9th Cir. 2003) is misguided. Unlike here, the plaintiff in *Chao* presented facts to support a finding of willfulness, including prior FLSA violations by the same defendant, supervisors telling employees that they could not afford to pay overtime without going bankrupt, and evidence of policies requiring employees to work eighty hours a week before being eligible for any overtime. *See id.* at 918-19. Plaintiffs do not offer any such evidence here.

### D. Section 7(i) Exemption

DIRECTV also moves for summary judgment pursuant to FLSA, 29 U.S.C. § 207(i), also known as the "Section 7(i)" exemption. The exemption provides that an employer is not liable for overtime compensation, if, among other requirements, "more than half" of the purported employees' compensation for the representative period is from "commissions." 29 U.S.C. § 207(i); *Matrai v. DIRECTV, LLC*, 168 F. Supp. 3d 1347, 1358 (D. Kan. 2016).

The FLSA does not define the term "commission" under Section 7(i). However, courts have generally identified three factors to establish when compensation is a commission:

> (1) the employee's compensation [is] tied to customer demand or the quantity of sales; (2) the compensation plan . . . provide[s] performance-based incentives for the employee to increase his or her income; and (3) there [is] proportionality between the value of the goods or services sold and the rate paid to the employee.

*Roeder v. Directv, Inc.*, No. 14-4091, 2017 WL 151401, at *29 (N.D. Iowa Jan. 13, 2017) (quoting *Johnson v. Wave Comm GR, LLC*, 4 F. Supp. 3d 423, 442 (N.D.N.Y. 2014)); *see also Arnold v. DIRECTV, LLC*, No. 10-352, 2017 WL 1196428, at *10 (E.D. Mo. Mar. 31, 2017).

The parties primarily dispute the second factor. Defendants assert that Plaintiffs earned additional money for a work order if they performed custom labor work not encompassed by the original work order or if they sold the DIRECTV protection plan to customers. (*E.g.*, First Dougherty Decl., Ex 10 at 41:12-42:13; Ex. 45 at 111:3-112:15.) Plaintiffs counter that it was extremely rare they would receive compensation for custom

labor because DIRECTV customers were told the entire installation would be free, (Werts Decl., Ex. 51 at 44:9-48:22), and that they did not receive additional money for installing upgraded equipment in customers' homes (*id.* at 111:16-112:2). Plaintiffs also provide evidence that they rarely picked up additional work orders in any given day, either because additional work orders were rarely given or because the technician could not fit additional work into his schedule. (Werts Decl., Ex. 48 at 86:9-87:6; *id.*, Ex. 57 at 119:2-120:14.)

Because there are disputed facts as to whether DIRECTV's compensation plan offered Plaintiffs performance-based incentives, the Court will deny DIRECTV's motion for summary judgment pursuant to the Section 7(i) exemption.

**II.   SANCTIONS**

Finally, Defendants move for sanctions and seek to strike the Declaration of Crystal R. Cook ("the Declaration"), which Plaintiffs filed as part of their opposition to the motion for summary judgment. (*See* Cook Decl.) Cook is "counsel of record for Plaintiffs." (*Id.* ¶ 1.) In the Declaration, Cook explains that she and her firm summarized SIEBEL data that DIRECTV produced "in a series of Microsoft Excel Spreadsheets" during discovery, (*id.* ¶¶ 1-2) and that she submitted the Declaration for the express purpose of providing a summary of that data pursuant to Rule 1006, (*id.* at ¶¶ 4-5). Based on this review of SIEBEL, Cook summarizes: (1) the total number of weeks Plaintiffs performed DIRECTV work orders, (*id.* ¶ 4), and (2) schedules about each Plaintiff, (*id.* ¶ 5).

Defendants contend the Declaration is improper under Rule 1006 because it is a lawyer-drafted document whose author is not subject to cross-examination and draws improper inferences and conclusions because it does not provide any reasoning of how Cook determined the summaries. However, the applicable standard "is not whether the evidence at the summary judgment stage would be admissible at trial – it is whether it **could** be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). Defendants do not dispute that there are other ways Plaintiffs may introduce SIEBEL data and reports at trial. Moreover, Cook explained that she created the summaries by using one of DIRECTV's management witnesses' described methodology to read Plaintiffs' SIEBEL schedules. (Cook Decl. ¶ 5 (citing Werts Decl., Ex. 14 at 143:13-17).) The Court will deny Defendants' motion for sanctions relating to the Declaration.[11]

This case will be placed on the Court's next available trial calendar.

---

[11] The Court also rejects Defendants' request to sanction Plaintiffs for failing to identify Cook as an individual with information related to this case in Plaintiffs' initial disclosures, supplemental disclosures, and responses to interrogatories. There is no evidence to support the notion that Cook had discoverable information related to SIEBEL. Cook explained that she summarized SIEBEL information produced by Defendants simply by reading the listed times as working hours on all days except the days listed as off. (*See* Cook Decl. ¶ 5 (citing Werts Decl., Ex. 14 at 143:13-17).)

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1. The Court **GRANTS in part** and **DENIES in part** Defendants' Motions for Summary Judgment [Docket Nos. 184 and 185] as follows:

    a. The Court **GRANTS** it the extent it seeks to limit Plaintiffs' FLSA claims to a two-year statute of limitations.

    b. The Court **DENIES** it in all other respects.

2. Defendants' Motion for Sanctions [Docket No. 226] is **DENIED**.

DATED: August 17, 2017　　　　　　　　　　_____s/John R. Tunheim_____
at Minneapolis, Minnesota.　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　Chief Judge
　　　　　　　　　　　　　　　　　　　United States District Court